1  M. KIRBY C. WILCOX (SB# 78576) kirbywilcox@paulhastings.com
   JENNIFER A. BLACKSTONE (SB# 226951) jenniferblackstone@paulhastings.com
2  ZACHARY P. HUTTON (SB# 234737) zachhutton@paulhastings.com
   CHRISTINA F. LATTA (SB# 257315) christinalatta@paulhastings.com
3  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   55 Second Street
4  Twenty-Fourth Floor
   San Francisco, CA  94105-3441
5  Telephone:  (415) 856-7000
   Facsimile:  (415) 856-7100
6
   Attorneys for Defendants
7  ARTHUR J. GALLAGHER SERVICE CO.,
   ARTHUR J. GALLAGHER & CO. and
8  GALLAGHER BASSETT SERVICES, INC.

9                UNITED STATES DISTRICT COURT

10              SOUTHERN DISTRICT OF CALIFORNIA

11

12  SCARLET KESHISHZADEH and LISA         CASE NO. 3:09-CV-0168 LAB (RBB)
    ARCHER, as individuals, on behalf of
13  themselves, and on behalf of all persons   (Consolidated with Case No. 3:09-CV-1273
    similarly situated,                        LAB (RBB))
14
                    Plaintiffs,            **DEFENDANTS' OPPOSITION TO**
15                                         **PLAINTIFFS' MOTION TO CERTIFY**
           vs.                             **CLASS ACTION**
16
    ARTHUR J. GALLAGHER SERVICE
17  CO., a Delaware corporation,           Date:    March 15, 2010
                                           Time:    11:15 a.m.
18                  Defendant.             Judge:   Hon. Larry A. Burns
                                           Ctrm:    9, 2nd Floor
19
    JAMES CAREY, on behalf of himself and
20  all others similarly situated,

21                  Plaintiffs,

22         vs.

23  ARTHUR J. GALLAGHER AND
    COMPANY, a Delaware Corporation, and
24  GALLAGHER BASSETT SERVICES,
    INC., a Delaware Corporation, inclusive,
25
                    Defendants.
26

27

28

─────────────────────────────────────────────
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY CLASS ACTION

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   STATEMENT OF FACTS ....................................................................................2

    A.    Gallagher's Business And The Putative Class.............................................2

    B.    Representatives Adjust Claims Worth Hundreds Of Millions Of Dollars Annually For Gallagher's Clients. ..............................................................3

    C.    Plaintiffs Admitted That Their Job Descriptions, Which Emphasize Non-Clerical Tasks, Accurately Describe The Work Gallagher Hired Them To Perform. .....................................................................................................3

    D.    Twenty-Two Declarations Of Representatives Confirm That The Job Descriptions Are Accurate.........................................................................3

        1.    Representatives investigate and assess the validity and compensability of each claim. ..................................................................4

        2.    Representatives prepare a unique plan of action for resolving every claim..........................................................................................................5

        3.    Representatives make decisions or recommendations about the amount of reserves clients set aside to cover the cost of claims.................5

        4.    Representatives make eligibility determinations. .........................................6

        5.    Representatives evaluate the medical treatment proposed by doctors to ensure that it is reasonable and cost-effective. .......................................6

        6.    Representatives determine whether third parties may be at fault for employees' injuries and advise clients about subrogation rights.................7

        7.    Representatives make decisions or recommendations regarding settlement for Gallagher's clients, and negotiate large settlements............7

        8.    Representatives direct the work of defense attorneys.................................8

        9.    Representatives work independently and make significant decisions before a supervisor reviews their claims.....................................................8

        10.   Representatives delegate a variety of clerical tasks to non-exempt Claims Assistants, and spend the majority of their work time performing duties that require analysis and decision making.....................8

    E.    An Expert Survey Confirmed That Most Putative Class Members Spend The Majority Of Their Work Time Analyzing Information And Making Decisions Or Recommendations, Not Performing Clerical Tasks. .........................9

    F.    Plaintiffs Did Not Disclose Their Startling Record Of Discipline And Performance Problems......................................................................................12

III.  CLASS CERTIFICATION SHOULD BE DENIED .........................................13

    A.    The Administrative Exemption Is At Issue................................................13

    B.    The Exempt Status Of Insurance Claims Adjusters Depends On The Work They Perform. ...........................................................................................14

        1.    Adjusters must perform work "directly related to the general business operations" of their employer.....................................................14

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY CLASS ACTION

### TABLE OF CONTENTS
(continued)

|  |  |  | Page |
|---|---|---|---|
| | 2. | Adjusters must exercise discretion and independent judgment. | 16 |
| C. | | Class Certification Should Be Denied Here Because Individualized Issues Predominate, And A Class Action Is Not Superior To Other Methods Of Adjudication. | 17 |
| | 1. | Individualized issues predominate because there is no common proof that class members perform the same job duties. | 17 |
| | 2. | A class action is not "superior" under Rule 23(b)(3) because (i) a trial over individuals' different job duties would be unmanageable, and (ii) class members have ample incentive to pursue claims. | 21 |
| | | a.   A class-wide trial would be unmanageable. | 21 |
| | | b.   Class members who wish to pursue individual claims have ample incentive to do so. | 22 |
| D. | | Plaintiffs' Arguments Are Without Merit. | 22 |
| | 1. | A so-called administrative-production dichotomy does not make the case proper for certification. | 22 |
| | | a.   The so-called "dichotomy" does not apply. | 23 |
| | | b.   Even if Locker were correct that the so-called dichotomy applied to Representatives' work for Gallagher itself, it does not apply to their work for Gallagher's clients. | 24 |
| | 2. | No common policies or practices limit the discretion and independent judgment exercised by Gallagher's Representatives. | 25 |
| | | a.   California workers' compensation law does not foreclose the exercise of discretion and independent judgment. | 25 |
| | | b.   Client-service instructions do not foreclose the exercise of discretion and independent judgment. | 26 |
| | | c.   The "Best Practices" do not foreclose the exercise of discretion and independent judgment. | 27 |
| | | d.   The "chain of command" does not foreclose the exercise of discretion and independent judgment. | 31 |
| | 3. | Gallagher has not asserted an "advice of counsel" defense. | 32 |
| | 4. | A "policy" of classifying employees as exempt does not warrant class treatment. | 33 |
| | 5. | The Private Attorneys General Act claim does not dispense with the Rule 23 analysis. | 34 |
| IV. | CONCLUSION | | 34 |

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY CLASS ACTION

# TABLE OF AUTHORITIES

**Page**

CASES

*Alba v. Papa John's USA, Inc.,*
    No. CV 05-7487, 2007 U.S. Dist. LEXIS 28079 (C.D. Cal. Feb. 7, 2007)...........................21

*Ali v. U.S.A. Cab Ltd.,*
    176 Cal. App. 4th 1333 (2009) .........................................................................................20

*Amalgamated Transit Union, Local 1756 v. Superior Court,*
    46 Cal. 4th 993 (2009) .....................................................................................................34

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997).....................................................................................................17, 21

*Armenta v. Osmose, Inc.,*
    135 Cal. App. 4th 314 (2005) ...........................................................................................24

*Bell v. Farmers Ins. Exch.,*
    115 Cal. App. 4th 715 (2004) ...........................................................................................23

*Bell v. Farmers Ins. Exch.,*
    87 Cal. App. 4th 805 (2001) .........................................................................15, 22, 23, 24

*Blue v. Chubb Group,*
    No. 03-C-6692, 2005 U.S. Dist. LEXIS 14253 (N.D. Ill. Jul. 13, 2005) ...............................30

*Bothell v. Phase Metrics, Inc.,*
    299 F.3d 1120 (9th Cir. 2002) ..........................................................................................24

*Campbell v. PricewaterhouseCoopers LLP,*
    253 F.R.D. 586 (E.D. Cal. 2008) ..................................................................................21, 33

*Cheatham v. Allstate Ins. Co.,*
    465 F. 3d 578 (5th Cir. 2006) ......................................................................................16, 30

*Combs v. Skyriver Communications, Inc.,*
    159 Cal. App. 4th 1242 (2008) ....................................................................................23, 24

*Coopers & Lybrand v. Livesay,*
    437 U.S. 463 (1978)..........................................................................................................13

*Donovan v. Burger King,*
    675 F.2d 516 (2d Cir. 1982) .............................................................................................30

*Dunbar v. Albertson's, Inc.,*
    141 Cal. App. 4th 1422 (2006) .........................................................................................19

-i-

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Gasperini v. Center for Humanities, Inc.*,
    518 U.S. 415 (1996)....................................................................................34

*Gen. Tel. Co. of the S.W. v. Falcon*,
    457 U.S. 147 (1982).....................................................................................17

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ..............................................................17, 21

*Harris v. Superior Court*,
    68 Cal. Rptr. 3d 528 (2007), *review granted*......................................22

*Heffelfinger v. Elec. Data Sys. Corp.*,
    580 F. Supp. 2d 933 (C.D. Cal. 2008) ...............................................15, 24

*Heffelfinger v. Elec. Data Sys. Corp.*,
    No. CV-07-00101, 2008 U.S. Dist LEXIS 5296 (C.D. Cal. Jan. 7, 2008)................34

*Hibbs-Rines v. Seagate Techs., LLC*,
    No. C-08-05430, 2009 U.S. Dist. LEXIS 19283 (N.D. Cal. Mar. 2, 2009) ............34

*In re Farmers Ins. Exch.*,
    466 F.3d 853 (9th Cir. 2006) ......................................................15, 16, 30

*In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.*,
    481 F.3d 1119 (9th Cir. 2007) ..............................................................23

*In re Wells Fargo Home Mortgage*,
    571 F.3d 953 (9th Cir. 2009) ............................................................33, 34

*Jaimez v. Daiohs USA, Inc.*,
    No. B209486, 2010 Cal. App. LEXIS 156 (2nd Dist. Jan. 12, 2010) ....................34

*Jimenez v. Domino's Pizza, Inc.*,
    238 F.R.D. 241 (C.D. Cal. 2006)...................................................18, 19, 22

*Keller v. Tuesday Morning, Inc.*,
    179 Cal. App. 4th 1389 (2009), ......................................................20

*Marlo v. United Parcel Service, Inc.*,
    251 F.R.D. 476 (2008)..............................................................13, 19, 21

*Marshall v. Union Pac. Motor Freight Co.*,
    650 F.2d 1085 (9th Cir. 1981) ..............................................................32

-ii-

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Matthews v. Book-Of-The-Month Club, Inc.,*

4
    62 F.R.D. 479 (N.D. Cal. 1974)..............................................................................22

*McAllister v. Transam. Occidental Life Ins. Co.,*

5
    325 F.3d 997 (8th Cir. 2003) ........................................................................26, 30

6

*Murray v. Ohio Cas. Corp.,*

7
    No. 2:04-CR-539, 2005 U.S. Dist. LEXIS 41374 (S.D. Ohio Sept. 27, 2005) ........16

8

*Nguyen v. BDO Seidman, LLP,*
    No. CV-07-01352, 2009 U.S. Dist. LEXIS 97524 (C.D. Cal. Jul. 6, 2009)...............13, 19, 21

9

*Nordquist v. McGraw-Hill Broad. Co.,*

10
    32 Cal. App. 4th 555 (1995) .......................................................................14

11

*Pablo v. ServiceMaster Global Holdings, Inc.,*

12
    No. C 08-03894, 2009 U.S. Dist. LEXIS 79584 (N.D. Cal. Aug. 17, 2009) ...........19

13

*Poulos v. Caesars World, Inc.,*
    379 F.3d 654 (9th Cir. 2004) .....................................................................17

14

*Ramirez v. Yosemite Water Co.,*

15
    20 Cal. 4th 785 (1999).........................................................................13, 14

16

*Sav-On Drug Stores, Inc. v. Superior Court,*

17
    34 Cal. 4th 319 (2004)...........................................................................21

18

*Sepulveda v. Wal-Mart Stores, Inc.,*
    237 F.R.D. 229 (C.D. Cal. 2006).................................................................18

19

*Tierno v. Rite Aid Corp.,*

20
    No. C 05-02520, 2006 U.S. Dist. LEXIS 71794 (N.D. Cal. Aug. 31, 2006) ...........21

21

*Vinole v. Countrywide Home Loans, Inc.,*

22
    571 F.3d 935 (2009)......................................................................13, 33, 34

23

*Walsh v. IKON Office Solutions, Inc.,*
    148 Cal. App. 4th 1440 (2007) ...............................................................19, 20

24

*Whiteway v. FedEx Kinko's Office & Print Svcs. Inc.,*

25
    No. C 05-2320, 2006 U.S. Dist. LEXIS 69193 (N.D. Cal. Sept. 14, 2006) .............21

26

*Zinser v. Accufix Research Inst., Inc.,*
    253 F.3d 1180 (9th Cir. 2001) ..................................................................22

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY CLASS ACTION

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3  **STATUTES**

4  Cal. Lab. Code § 515(a) ..................................................................................14

5  Cal. Lab. Code §  203 ...................................................................................13

6  Cal. Lab. Code §  226 ...................................................................................13

7

8  **OTHER AUTHORITIES**

9  29 C.F.R. § 541.203(a) ..................................................................................15

10  29 C.F.R. § 541.205(c)(5) (2000) ...................................................................15

11  29 C.F.R. § 541.205(d) (2000).......................................................................25

12  29 C.F.R. § 541.207(a) (2000)........................................................................16

13  29 C.F.R. § 541.208 (2000) ............................................................................18

14  Cal. R. Ct. 8.1115(b).......................................................................................22

15  DLSE Op. Ltr. 1998.10.05,..............................................................................24

16  DLSE Op. Ltr. 2003.05.23, .............................................................................24

17  DOL Op. Letter FLSA2002-11 (Nov. 19, 2002) ......................................15, 16

18  DOL Op. Letter FLSA2005-25 (Aug. 26, 2005) ......................................16, 25

19  IWC Wage Order 4-2001.............................................................................14, 18

20  I.W.C. Wage Order 4-2001, § 1(A)(2) .............................................14, 16, 23, 25

21  Fed. R. Civ. Proc. 23..................................................................13, 17, 34

22  Fed. R. Civ. Proc. 23(b)(3) .......................................................17, 21, 33

23
24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY CLASS ACTION

1    **I.     INTRODUCTION**

2           Some overtime cases can present common issues appropriate for class treatment. This

3    case does not.

4           Plaintiffs purport to represent all Claim Representatives and Senior Claim

5    Representatives who adjust workers' compensation claims for Defendants in California. An

6    exempt status class action requires common proof concerning the amount of time class members

7    spend performing certain duties, the nature of their work, and the degree to which they exercise

8    discretion and independent judgment. Plaintiffs claim that adjusters by policy spend most of

9    their time performing routine, clerical tasks, but they overlook three compelling sources of proof:

10          (1)     <u>Plaintiffs own deposition admissions</u>. Plaintiffs in deposition admitted that their

11   job descriptions — which identified the need to exercise discretion and independent judgment —

12   accurately described their jobs. They also admitted that the company "guidelines" they now cite

13   as common proof of restricted decision-making *never* dictated the decisions they made, the

14   conclusions they reached, or the manner in which they performed important aspects of their job.

15          (2)     <u>Class-member declarations</u>. What the *complete* record shows is that many

16   adjusters spend the majority of their work time on the following duties:

17          •       investigating and evaluating facts, and developing strategies for resolving

18                  claims;

19          •       making a variety of final decisions with respect to their claims (or, when

20                  they need a client's or supervisor's approval, making recommendations

21                  that normally are followed);

22          •       delegating clerical tasks to non-exempt employees; and

23          •       working independently, under only general supervision.

24          (3)     <u>Expert survey data</u>. The Field Research Corporation surveyed a statistically

25   reliable sample of 151 current and former adjusters. That survey confirmed that most putative

26   class members do not perform the routine tasks Plaintiffs described. Instead, they spend most of

27   their work time evaluating information, and making important decisions (or recommendations

28   that were "often" or "always" approved).

1    Plaintiffs contend, however, that they (and their five declarants) perform their work

2   differently from that.  Let us assume that they performed their jobs as described.  Those

3   differences are reasons to deny class certification, not to grant it.  The lack of common proof that

4   all putative class members perform their jobs in the same (or even a similar) manner makes it

5   impossible to satisfy Rule 23's stringent requirements.  If the class representatives do not speak

6   for the whole, and it is clear (as here) that there are members of the alleged class who will

7   describe very different duties and responsibilities, there can be no class.

8   **II.    STATEMENT OF FACTS**

9        **A.    Gallagher's Business And The Putative Class.**

10        Defendant Gallagher Bassett Services, Inc. is a third-party administrator that

11   adjusts workers' compensation insurance claims for its customers, not for itself.  (Ponta ¶ 3.)[1]

12   Their customers include insurance carriers that sell and write workers' compensation insurance

13   policies, and employers that self-insure workers' compensation benefits for their employees.  (*Id.*)

14   Thus, Gallagher's customers outsource to Gallagher administrative functions related to their

15   policies, including claims adjusting.  (*Id.*)

16        Gallagher classifies some of its adjusters as exempt from overtime requirements,

17   and pays them a salary.  (*Id.* ¶ 4.)  It classifies others as hourly paid non-exempt employees.  (*Id.*

18   ¶ 5.)  Two categories are non-exempt:  Claims Service Representatives and Claim Representative

19   Trainees.  (*Id.*)  Employees in these non-exempt positions typically adjust "medical only"

20   workers' compensation claims, which involve less-severe injuries that do not result in lost work

21   time.  (*Id.*)  On the other hand, Claim Representatives and Senior Claim Representatives

22   (collectively, "Representatives"), the job categories at issue in this case, adjust "indemnity"

23   workers compensation claims, which involve more-severe injuries that cause employees to miss

24   work.  (*Id.* ¶ 4.)  These claims carry larger potential exposure.  (*Id.*)

25        All Representatives adjust claims for one or more specific Gallagher clients.  (*Id.* ¶

26   9.)  Each client provides a set of "client service instructions" that describe the client's contractual

27   [1] Plaintiffs allege that three related entities, Arthur J. Gallagher Service Co., Gallagher Bassett

28   Services, Inc. and Arthur J. Gallagher & Co., jointly employed them.  For purposes of this motion only, Defendants (collectively, "Gallagher") assume that to be true.

- 2 -

procedural requirements for adjusting its claims, such as the circumstances in which Gallagher must obtain the client's approval for reserves, settlements, or other activities. (*Id.*)

In the four years preceding this lawsuit, Gallagher employed 136 current and former Claim Representatives and 358 current and former Senior Claim Representatives at 15 locations throughout California. (Woods ¶ 3.)[2] Gallagher during that period paid Claim Representatives, on average, annual salaries of $58,337, and Senior Claim Representatives, on average, $69,695. (Woods ¶ 3.)

### B. Representatives Adjust Claims Worth Hundreds Of Millions Of Dollars Annually For Gallagher's Clients.

From January 2005 through December 22, 2009, Gallagher's 441 Representatives adjusted 93,317 claims (an average of 212 per adjuster) that required $2,258,108,496 in payments from inception to close (an average of $5,120,427 per adjuster). (Woods ¶ 4; Bergquist ¶¶ 2, 3.)

### C. Plaintiffs Admitted That Their Job Descriptions, Which Emphasize Non-Clerical Tasks, Accurately Describe The Work Gallagher Hired Them To Perform.

Plaintiffs' job descriptions hold them responsible for the "investigation, evaluation, disposition, and settlement" of claims. (Carey Dep. 188:21-189:5; 189:18-21; Ex. 13; Keshishzadeh Dep. 158:21-159:10; Ex. 15.)[3] Plaintiffs Carey and Keshishzadeh admitted that their job descriptions accurately describe the duties Gallagher hired them to perform. (*Id.*) Those duties include exercising "proper judgment and decision making to analyze the claims exposure, to determine the proper course of action and to appropriately settle the claim," as well as "think[ing] critically, solv[ing] problems, plan[ning] and organiz[ing] activities, serv[ing] clients, negotiat[ing] . . . and embrac[ing] new challenges." (Ex. 15.) As Plaintiff Carey put it, "Well, this is what they hired me to do." (Carey Dep. 188:21-189:5.)

### D. Twenty-Two Declarations Of Representatives Confirm That The Job Descriptions Are Accurate.

The declarations of 22 employees, filed concurrently with Gallagher's opposition

---

[2] Because some employees held both positions during the class period, there are 441 individuals in the putative class. (Woods ¶ 3.)
[3] Cited deposition pages and exhibits are attached to the Declaration of Zachary P. Hutton.

- 3 -

("Declarants"), make clear that many Representatives spend most of their time investigating claims; calculating and setting reserves (an amount of money the client estimates and sets aside to cover the anticipated cost of a claim); preparing plans of action that describe their strategy for resolving claims; making eligibility determinations; determining what disability benefits claimants should receive; evaluating the medical treatment recommended by doctors; determining whether third parties may be at fault for employees' injuries, and advising Gallagher's clients about their subrogation rights against those third parties; making decisions and recommendations about settlement; negotiating settlements; and directing the work of defense attorneys retained by clients. (Claim Rep. Decls.; *see, e.g.,* Manage ¶¶ 12, 15, 18, 19, 23, 24, 26.)[4] As described more fully below, Representatives engage in analytical work that requires them to make significant decisions and recommendations.

1. **Representatives investigate and assess the validity and compensability of each claim.**

For each claim, a Representative conducts an investigation to determine whether s/he should accept, delay or deny the claim; what benefits the claimant may be entitled to receive; whether the client could pursue subrogation rights against third parties; whether any aspect of the claim may be fraudulent; and what reserves the client should establish for the claim. (Claim Rep. Decls.; *see, e.g.,* J. Williams ¶ 12.) The Representative interviews the injured worker who filed the claim, the employer, and the treating physician to collect information. (*Id.*) Depending on the facts, they may interview other witnesses, or retain a third-party investigator to conduct surveillance or other investigative activities. (*Id.*) Some Representatives said they need a supervisor's or client's approval to retain third-party investigators; others said they do not. (*Compare* Swenson ¶ 13 *with* Henry ¶ 12.) The Declarants who need prior approval to retain an investigator make recommendations to retain them, which are always (or at least typically) followed. (Claim Rep. Decls.; *see, e.g.,* Swenson ¶ 13.) Unlike the Plaintiffs (who say that they used a "script" to interview witnesses and did not develop their own questions), the Declarants

---

[4] The 22 declarations of putative class members ("Claim Rep. Decls.") are attached as Exhibit A to the Declaration of Zachary P. Hutton.

1   confirmed that the scope, length and direction of their investigations, and the questions they ask
2   during witness interviews, depend upon — and flow from — the specific facts of the claim.  (*Id.*;
3   *see, e.g.,* Wilson ¶ 12.)

**2.   Representatives prepare a unique plan of action for resolving every claim.**

6   The strategies and tactics Representatives propose depend on the strength of the
7   claim, its complexity, the treating physician's recommendations, whether the claim is litigated,
8   and their own assessment of what steps would enable to client to resolve the claim at a reasonable
9   cost. (Claim Rep. Decls.; *see, e.g.,* Swenson ¶¶ 20-22.) Every plan of action they prepare is
10  unique, tailored to the facts of the claim. (*Id.*)

**3.   Representatives make decisions or recommendations about the amount of reserves clients set aside to cover the cost of claims.**

13  The declarants also set reserves for each claim they adjust. (Claim Rep. Decls.;
14  *see, e.g.,* Couchot ¶ 15.) Representatives tailor reserves to the specific facts of each claim, taking
15  into account the information they learn during their investigations. (*Id.*) Representatives
16  reevaluate reserves as they discover new facts. (*Id.*)

17  To calculate reserves, Representatives take into account a number of factors that
18  could affect the ultimate cost of a claim, including the type of injury the claimant experienced; the
19  severity of the injury; the claimant's medical history; the cost of proposed medical treatment; how
20  much time the claimant will miss from work; the possibility of accommodating work restrictions;
21  the claimant's age, occupation, and income; whether the claimant is represented by an attorney;
22  and expected litigation costs. (Claim Rep. Decls.*; see, e.g.,* Magin ¶ 18.)

23  Representatives do not depend on computer software to calculate reserves. (Claim
24  Rep. Decls.; *see, e.g.,* Wittnebel ¶ 15.) Software called "MIRA" provides reserve *estimates* based
25  on certain information about the claim. (*Id.*) However, Representatives independently calculate
26  reserves for each claim, and do not rely on MIRA's estimates. (*Id.*) Representatives can and
27  frequently do set reserves that differ from MIRA's estimates. (*Id.* ¶ 16.)

28  Representatives have authority to set reserves within certain limits without

- 5 -

obtaining prior approval from a supervisor, or even the client. (Claim Rep. Decls.; *see, e.g.,* Ashby ¶ 14)   Their authority to set reserves without a supervisor's approval ranges from $30,000 to $200,000. (*Compare* Arnold ¶ 14 *with* Nava ¶ 14.)  Their authority to set reserves without the client's approval ranges from $10,000 to $200,000, depending on the client. (*Compare* Ashby ¶ 14 *with* Nava ¶ 14.)  When Representatives determine that a claim warrants a higher reserve, they make recommendations that their supervisors and/or client almost always, or at least typically, approve. (Claim Rep. Decls.; *see, e.g.,* Clifford ¶ 14.)

### 4.   Representatives make eligibility determinations.

Representatives make eligibility determinations for each claim they adjust, based on their assessment of the claim and the information they learn during their investigations. (Claim Rep. Decls.; *see, e.g.,* Magin ¶ 22.)  Representatives can accept a claim, and pay benefits, without obtaining anyone's approval. (*Id.*)  Some need a supervisor's approval to delay claims for further investigation, while others do not. (*Compare* Wilson ¶ 18 *with* Werner ¶ 20.) Representatives need a supervisor's approval to deny a claim. (Claim Rep. Decls.; *see, e.g.,* Henry ¶ 20.)   However, Representatives make recommendations to deny claims, which their supervisors almost always, or at least typically, approve.  (*Id.*)

### 5.   Representatives evaluate the medical treatment proposed by doctors to ensure that it is reasonable and cost-effective.

Once they approve a claim, Representatives evaluate the medical treatment proposed by the injured worker's doctor. (Claim Rep. Decls.; *see, e.g.,* J. Williams ¶ 21.)  If they have doubts about a proposed treatment, or do not believe it is cost-effective, they can request an Agreed Medical Evaluation ("AME") (involving a doctor mutually agreed upon by the adjuster and the claimant) or a Qualified Medical Evaluation ("QME") (involving a doctor chosen from a panel). (*Id.*)  Whether to seek an AME or QME depends on each claim's particular facts. (*Id.* ¶ 22.)  Representatives also can choose to have the treatment evaluated through the "utilization review" process, an internal process for evaluating a physician's proposed treatment. (Ashby ¶ 20.)

Representatives almost never need advance approval to seek an AME, QME, or

- 6 -

1   utilization review, even though these processes increase the cost of a claim. (Claim Rep. Decls.;

2   *see, e.g.,* Werner ¶ 23.)

3           6.     **Representatives determine whether third parties may be at fault for**

4               **employees' injuries and advise clients about subrogation rights.**

5         Representatives advise clients about whether they should pursue subrogation,

6   taking into account the facts supporting the subrogation claim, the amount of money involved,

7   and the likelihood and expense of recovering the money. (Claim Rep. Decls.; *see, e.g.,* Manage ¶

8   23.) Clients typically follow the Representative's recommendation. (*Id.*)

9           7.     **Representatives make decisions or recommendations regarding**

10              **settlement for Gallagher's clients, and negotiate large settlements.**

11        Representatives calculate the settlement value of claims, taking into account a

12  variety of factors, including the nature and seriousness of the injury, the likely cost and duration

13  of future medical treatment, witness credibility, the risk of litigation, the cost of litigation and

14  likelihood of success, and any other pertinent information. (Claim Rep. Decls.; *see, e.g.,*

15  Wittnebel ¶ 22.)

16        Representatives also negotiate settlements. (Claim Rep. Decls.; *see, e.g.,* Ashby ¶

17  24, 25.) Their authority to negotiate settlements without prior approval varies. Some do not need

18  a supervisor's advance approval for any settlements; others need approval for settlements at levels

19  ranging from $20,000 to $100,000. (*Compare* Arnold ¶ 27 *with* Wilkenfeld 27 *and* Knorr ¶ 27.)

20  Their authority to negotiate settlements without client approval varies, depending on the client(s)

21  with whom they work, and ranges from $10,000 to $100,000. (*Compare* Manage ¶ 25 *with* Knorr

22  ¶ 27.)

23        Negotiations and settlements vary from person to person. (Claim Rep. Decls.; *see,*

24  *e.g.,* Schaffer ¶ 27; Wilkenfeld ¶ 27; Brown ¶ 27.) One Declarant negotiates only five or six

25  settlements per year, while others negotiate 75 settlements per year. (*Compare* Henry ¶ 26 *with*

26  Wilson ¶ 23.) Some have negotiated settlements of up to $25,000, while others have negotiated

27  six-figure settlements. (*Compare* Werner ¶ 27 *with* Belchamber ¶ 27.) One Declarant negotiated

28  a $750,000 settlement. (Ashby ¶ 25.)

**8.     Representatives direct the work of defense attorneys.**

Representatives also make recommendations (which are typically approved) about whether clients should retain defense attorneys, and then direct the work of attorneys assigned to their claims. (Claim Rep. Decls.; *see, e.g.,* Belchamber ¶¶ 28, 29.) Anywhere from 20% to 90% of Representatives' claims involve litigation, depending on the adjuster. (*Compare* Ecker ¶ 26 *with* Manage ¶ 26.) In litigated cases, Representatives direct the work of defense attorneys and control the direction of the case. (Claim Rep. Decls.; *see, e.g.,* Manage ¶ 26.) Defense attorneys cannot take discovery, seek medical evaluations, engage in settlement discussions, request hearings, or take any other action on a claim without the Representatives' advance approval. (*Id.*) Representatives also review defense attorneys' litigation plans, determine the strategy and tactics attorneys take in litigation, drive settlement discussions in litigated cases, and oversee defense counsel's work to ensure that their tactics are reasonable and cost-effective for Gallagher's clients. (*Id.*)

**9.     Representatives work independently and make significant decisions before a supervisor reviews their claims.**

Representatives work independently, not under close supervision. (Claim Rep. Decls.; *see, e.g.,* Ecker ¶ 27.) Supervisors review Representatives' work infrequently; they typically conduct a general review 30 days after assigning a claim, and then review the claim every 90 days thereafter. (*Id.*) By the time of the initial 30-day review, Representatives normally have conducted an investigation, set reserves within their assigned limits, prepared a plan of action, and paid benefits on claims they approved. (*Id.*) In some cases, they completely resolve a claim before a supervisor reviews their work. (*Id.*)

**10.     Representatives delegate a variety of clerical tasks to non-exempt Claims Assistants, and spend the majority of their work time performing duties that require analysis and decision making.**

Representatives delegate numerous clerical tasks to non-exempt Claims Assistants, including generating form letters and notices, making routine telephone calls, subpoenaing records, processing benefit payments, and paying bills. (Claim Rep. Decls.; *see, e.g.,* Manage ¶ 29.) Consequently, Representatives devote most of their work time to the substantive duties

- 8 -

1  described in the sections above.  (*Id.* ¶ 30)  They also spend most of their work time (ranging,

2  Declarant to Declarant, from "more than 50%" to "100%") evaluating facts, and making choices

3  or decisions based on their evaluation of those facts.  (*Compare* Ecker ¶ 31 *with* Singh ¶ 35.)

**E.     An Expert Survey Confirmed That Most Putative Class Members Spend The Majority Of Their Work Time Analyzing Information And Making Decisions Or Recommendations, Not Performing Clerical Tasks.**

6           The Court need not rely solely on the facts asserted by the Declarants.  A recent

7  statistically significant survey of 151 randomly selected putative class members (including 84

8  current employees and 67 former employees) conducted by E. Deborah Jay, Ph.D., the CEO of

9  Field Research Corporation, confirms that employees do not perform their work in the manner

10 described by Plaintiffs.

11          For example, **90%** of the 151 respondents said they spend more than 50% of their

12 time investigating claims, setting reserves, reviewing and evaluating medical treatment, preparing

13 plans of action, determining a claim's settlement value, negotiating settlements, and working with

14 defense counsel.  (Jay ¶ 2, Ex. A, pp. 4, 34-35.)  These tasks require analyzing information and

15 making decisions or recommendations.  Between **77%** and **99%** of respondents "often" or

16 "always" analyze information for the following purposes when adjusting a claim:

17     •      setting a reserve for a claim (99%);

18     •      determining what disability benefits a claimant is entitled to receive (99%);

19     •      determining the settlement value of a claim (97%);

20     •      preparing a plan of action for resolving a claim (97%);

21     •      determining whether or not to accept a claim (94%);

22     •      determining whether or not to apportion disability benefits (93%);

23     •      determining whether MIRA reserves appropriately accounted for the facts

24            of a claim (89%);

25     •      determining whether or not to delay a claim for further investigation

26            (87%);

27     •      determining whether or not to authorize a course of medical treatment

28            (85%);

- 9 -

- determining whether or not fraud, malingering or abuse is suspected (83%);
- determining whether or not a client can pursue subrogation rights (80%); and
- determining whether or not a claim should be denied (78%).

(*Id.* pp. 2, 23-25.)

Between **64%** and **98%** of respondents "often" or "always" make decisions concerning the following:

- what disability benefits a claimant is entitled to receive (98%);
- the plan of action for resolving a claim (96%);
- the settlement value of a claim (93%);
- the amount of reserve to set for a claim (93%);
- whether or not to accept a claim (91%);
- whether MIRA reserves appropriately accounted for the facts of a claim (85%);
- whether or not to delay a claim for further investigation (81%);
- how to handle claims when fraud, malingering, or abuse is suspected (77%);
- whether or not to authorize a course of medical treatment (76%);
- whether or not a claim should be denied (71%);
- whether or not to apportion disability benefits (70%); and
- whether or not a client can pursue subrogation rights against third parties (64%).

(*Id.* pp. 3, 26-28.)

Among those who do not "always" make *decisions* on these matters, between **50%** and **96%** "often" or "always" make *recommendations* concerning the following:

- what disability benefits a claimant is entitled to receive (96%);
- the plan of action for resolving a claim (96%);
- the settlement value of a claim (93%);

- 10 -

- the amount of reserve to set for a claim (91%);

- whether or not to accept a claim (85%);

- whether MIRA reserves appropriately accounted for the facts of a claim (78%);

- whether or not to apportion disability benefits (69%);

- whether or not to authorize a course of medical treatment (68%);

- how to handle claims when fraud, malingering, or abuse is suspected (64%);

- whether or not to delay a claim for futher investigation (60%);

- whether or not a client can pursue subrogation rights against third parties (53%);

- whether or not a claim should be denied (50%); and

(*Id.* pp. 3, 29.)

Furthermore, a supermajority of respondents who make recommendations said their recommendations were "often" or "always" followed (ranging from **77%** concerning whether or not to apportion disability benefits, to **100%** concerning what disability benefits a claimant is entitled to receive). (*Id.* pp. 4, 30-32.)

Finally, the survey confirmed that most putative class members have significant responsibilities concerning settlements and oversight of defense attorneys. Eighty-six percent (**86%**) of respondents "often" or "always" negotiate the settlement of a claim. (*Id.* p. 32.) In addition, **93%** of respondents are "often" or "always" responsible for overseeing lawyers' activities on their claims, and **91%** "often" or "always" make decisions concerning how to defend a case when the client retains a defense attorney. (*Id.* p. 33.)[5]

---

[5] Plaintiffs' expert, Lavitt, quotes Jeff Ponta, a Branch Manager, as stating that "general file control, investigation, and active claims management alone likely consume more than 50% of a claims representative's day-to-day time." (Lavitt Report, p. 25.) Lavitt neglects to mention that Ponta's testimony actually covered evaluating a claim, investigation, compensability decisions, overseeing medical treatment, managing litigation, subrogation, settlement and settlement evaluation. (Ponta Dep. 174:4-24; 177:1-15; Ex. 16.)

- 11 -

**F.**    <u>Plaintiffs Did Not Disclose Their Startling Record Of Discipline And Performance Problems.</u>

Plaintiffs and their five declarants describe their work as "routine and repetitive" clerical tasks. However, these employees' unusual record of discipline — which Plaintiffs did not disclose — underscores that the work they performed was neither typical nor satisfactory.

Gallagher discharged four of the eight (Carey, Keshishzadeh, Casey, and Rose); placed another (Hartsock) on a formal performance improvement plan; and reprimanded another (Ulloa) for performance problems. Specifically:

- Gallagher counseled Carey, placed him on a performance improvement plan, and ultimately fired him. (Carey Dep. 201:1-202:9; 204:16-206:23; 208:23-210:6; Exs. 16-18.) At each stage of discipline, Carey's managers criticized him for reciting "generic" plans for resolving claims, rather than developing creative, "proactive" approaches. (*Id.*)

- Gallagher eliminated Keshishzadeh's position, selecting her for discharge because she "was the poorest performing adjuster in the unit, and the client was not particularly pleased with her." (Martinsson Dep. 234:7-17.) Keshishzadeh herself admitted that her Branch Manager told her "some clients, they complained about my performance." (Keshishzadeh Dep. 10:23-11:6; 14:18-25; Ex. 1.) Her discharge letter stated that "your level of performance has not met expectations." (*Id.,* Ex. 1.)

- Gallagher discharged Casey because two clients complained about her work and refused to allow her to adjust their claims. (Martinsson ¶¶ 3-4, Ex. A.)

- Gallagher discharged Rose for insubordination and dishonesty. (Hom ¶ 6, Ex. A.)

- Gallagher placed Hartsock on a performance improvement plan because she, like Carey, recited only generic plans for resolving claims, using "cut and pasted" information. (Lara ¶¶ 4-5, Ex. A.)

- 12 -

- Ulloa resigned shortly after her supervisor formally reprimanded her for performance problems. (Fiola ¶¶ 5-7, Ex. A.) Her performance deficiencies included poor time management, inattention to detail, inappropriate relations with a client, and failing to set adequate reserves. (*Id.*)

The point is not that the Plaintiffs and their declarants were poor performers (although at least six of the eight were). Rather, the point is that they did not perform the job as Gallagher designed it and as others performed it. *See Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 802 (1999). The discipline administered to the Plaintiffs and Declarants goes to the heart of the class certification inquiry because it demonstrates that their work experiences do not provide common proof of the work performed by other adjusters.

## III.   CLASS CERTIFICATION SHOULD BE DENIED

The motion should be denied because the Plaintiffs have not carried their burden under Rule 23 to supply common proof required to resolve their claims on a class-wide basis.[6]

### A.   The Administrative Exemption Is At Issue.

Plaintiffs' claims turn on whether Gallagher properly classified Representatives as exempt, administrative employees. The court can, and should, consider the elements of the administrative exemption to determine whether Plaintiffs' claims are susceptible to common proof. *See, e.g., Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) ("the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action'") (quoting *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 558 (1963)).[7]

---

[6] Plaintiffs also seek to certify "derivative" claims for waiting time penalties under Labor Code section 203, and penalties for inaccurate paystubs under Labor Code section 226. Because these claims are founded on Plaintiffs' allegation that Gallagher misclassified them as exempt and did not pay all legally required overtime compensation, Plaintiffs cannot maintain these claims on a class-wide basis for the same reasons.

[7] Courts routinely evaluate the elements of overtime exemptions to determine whether common proof exists. *See, e.g., Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944-45 (2009) (reviewing elements of outside sales exemption); *Marlo v. United Parcel Service, Inc.*, 251 F.R.D. 476, 481 (2008) (executive exemption); *Nguyen v. BDO Seidman, LLP*, No. CV-07-01352, 2009 U.S. Dist. LEXIS 97524, at *16-22 (C.D. Cal. Jul. 6, 2009) (administrative exemption).

- 13 -

1    To qualify for the California administrative exemption, employees must: (1)

2    perform office or non-manual work directly related to management policies or general business

3    operations of their employer or their employer's customers; (2) exercise discretion and

4    independent judgment; and (3) either (i) regularly and directly assist an employee in a bona fide

5    executive or administrative capacity; (ii) perform under only general supervision work along

6    specialized or technical lines, requiring special training, experience, or knowledge; or (iii) execute

7    special assignments and tasks under only general supervision. *See* I.W.C. Wage Order 4-2001, §

8    1(A)(2).[8]

9    The exemption depends on how an individual actually performs his or her job

10   duties. Exempt employees must spend more than 50% of their work time performing exempt

11   tasks. *See* Cal. Lab. Code § 515(a); IWC Wage Order 4-2001 at §§ (1)(A)(1)-(2); *Ramirez*,

12   20 Cal. 4th at 797, 802-03 n.5 (the approach to determining exempt status is "purely quantitative .

13   . . focusing exclusively on whether the individual 'works more than half the working time'"

14   performing qualifying duties) (citation omitted). Exempt status for a particular individual does

15   not depend on title, job description, quantity of work, or how some other person performs the

16   same job; it depends on how that particular employee actually spends his or her work time. *See,*

17   *e.g., Nordquist v. McGraw-Hill Broad. Co.*, 32 Cal. App. 4th 555, 568 (1995) (plaintiff was

18   entitled to overtime compensation, even though in a prior case someone holding exactly the same

19   position was held exempt; the other plaintiff worker performed different duties).

   **B.**    **The Exempt Status Of Insurance Claims Adjusters Depends On The Work**
20            **They Perform.**
21
            **1.**    **Adjusters must perform work "directly related to the general business**
22                    **operations" of their employer.**

23       The administrative exemption in California is based in significant respects on the
24
    federal Fair Labor Standards Act ("FLSA") regulations incorporated into the Wage Order.[9]
25
────────────────────────────────────
[8] Employees also must receive a salary of at least twice the minimum wage. I.W.C. Wage Order
26   4-2001, § 1(A)(2). The salary element is not controverted here.
[9] The Wage Order that sets forth California's administrative exemption expressly incorporates
27   certain federal regulations interpreting the FLSA. In particular, section 1(A)(2)(f) of the Wage
     Order states "[t]he activities constituting exempt work and non-exempt work shall be construed in
28   the same manner as such terms are construed in the following regulations under the Fair Labor

- 14 -
────────────────────────────────────

1   Those regulations specifically identify "claims agents and adjusters" as the kind of employees

2   who meet the test for whether their work is "directly related to management policies or general

3   business operations." *See* 29 C.F.R. § 541.205(c)(5) (2000).  In addition, the U.S. Department of

4   Labor, in a 2002 opinion letter interpreting those regulations, stated that insurance adjusters, who

5   performed tasks such as investigating claims, evaluating coverage and liability, establishing

6   reserves, and collaborating with the company's counsel, qualified as exempt even though they

7   needed a supervisor's approval for some decisions, because their duties "related to servicing the

8   business." DOL Op. Letter FLSA2002-11 (Nov. 19, 2002) (Request for Judicial Notice ("RJN"),

9   Ex. A.)  Thus, adjusters whose duties are not limited to "routine, unimportant" tasks qualify for

10  the exemption.

11          The current FLSA regulations specifically state:

12          *Insurance claims adjusters generally meet the duties requirements*
            *for the administrative exemption, whether they work for an*
13          *insurance company or other type of company*, if their duties include
            activities such as interviewing insureds, witnesses and physicians
14          . . . reviewing factual information to prepare damage estimates;
            evaluating and making recommendations regarding coverage of
15          claims; determining liability and total value of a claim; negotiating
            settlements; and making recommendations regarding litigation.
16

17  29 C.F.R. § 541.203(a) (emphasis added).  As the Ninth Circuit explained in *In re Farmers Ins.*

18  *Exch.*, 466 F.3d 853 (9th Cir. 2006), this regulation did not change the law.  Instead:

19          For more than 50 years, the Department of Labor has considered
            claims adjusters exempt from the Fair Labor Standards Act's overtime
20          requirement. In 2004, the DOL promulgated 29 C.F.R. § 541.203,
            which it viewed as "consistent with" existing law. Section 541.203
21          exempts claims adjusters if they perform activities such as
            interviewing witnesses, making recommendations regarding coverage
22          and value of claims, determining fault and negotiating settlements.

23  Standards Act as of the date of this order:  29 C.F.R. Sections 541.201-205, 541.207-208,
    541.210, and 541.215."  Moreover, although the Department of Labor revised the FLSA
24  regulations in August 2004, after the promulgation of the Wage Order, the revised regulations are
    relevant to the determination of an employee's exempt status under California law because the
25  amendments "were not meant to effect any substantive change in the exemptions." *Heffelfinger*
    *v. Elec. Data Sys. Corp.*, 580 F. Supp. 2d 933, 950 n.7 (C.D. Cal. 2008) ("This interpretation is
26  strengthened by the fact that the preamble to the proposed amended regulations state that the
    changes were made 'to simplify and update the current regulations' . . . not to effect a major
27  alteration in how exemptions are construed[.]") (citing *IntraComm, Inc. v. Bajaj*, 492 F.3d 285,
    295 n.7 (4th Cir. 2007)); *see also Bell v. Farmers Ins. Exch.*, 87 Cal. App. 4th 805, 817 (2001)
28  (noting the relevance of federal authorities to the interpretation of the Wage Orders).

- 15 -

1   *Id.* at 855.

2       **2.   Adjusters must exercise discretion and independent judgment.**

3       To qualify for the exemption, an employee must "customarily and regularly

4   exercise discretion and independent judgment." I.W.C. Wage Order 4-2001, § 1(A)(2).  The

5   touchstone for discretion and independent judgment is whether an employee's work involves

6   "comparison and the evaluation of possible courses of conduct and acting or making a decision

7   after the various possibilities have been considered." 29 C.F.R. § 541.207(a) (2000).  An

8   employee need not make final and unreviewable decisions.  Instead:

> Decisions made as a result of discretion and independent judgment
> may consist of *recommendations* for action rather than the actual
> taking of action. *The fact that an employee's decision may be subject
> to review and that upon occasion the decisions are revised or reversed
> after review does not mean the employee is not exercising discretion
> and independent judgment.*

13  *Id.* § 541.207(e)(1) (2000) (emphasis added); *accord* DOL Op. Letter FLSA2002-11 (Nov. 19,

14  2002) (adjusters with "quite limited levels of authority, as low as $3,000" qualify as exempt

15  where they use "their own judgment about what the facts show, who is liable, [and] what a claim

16  is worth").  (RJN, Ex. A.)

17      The cases are to the same effect.  *E.g.*, *In re Farmers Ins. Exch.*, 466 F.3d at 864

18  (adjusters held exempt, even though some had settlement authority of only $3,000; they

19  conducted investigations, recommended reserves, advised of the potential for subrogation,

20  estimated liability and negotiated settlements); *Cheatham v. Allstate Ins. Co.*, 465 F. 3d 578, 585-

21  86 (5th Cir. 2006) (adjusters held exempt; they "were expected to make a recommendation based

22  on their experience and knowledge of the case and to explain their reasons for recommendation");

23  *Murray v. Ohio Cas. Corp.*, No. 2:04-CR-539, 2005 U.S. Dist. LEXIS 41374, at *29 (S.D. Ohio

24  Sept. 27, 2005) ("While it is true that Plaintiff did not have ultimate authority . . . the record

25  clearly shows that Plaintiffs' duties involved the level of discretion and independent judgment

26  contemplated by the regulations."); *cf.* DOL Op. Letter FLSA2005-25 (Aug. 26, 2005) (workers'

27  compensation adjusters held exempt; they "are not merely using a standardized format for

28  resolving claims, but rather are using their own judgment about what the facts show, who is

- 16 -

1   liable, what a claim is worth, and how to handle the negotiations with the claimant or the

2   claimant's representative"). (RJN, Ex. B.)

3       **C.    Class Certification Should Be Denied Here Because Individualized Issues
               Predominate, And A Class Action Is Not Superior To Other Methods Of
4              Adjudication.**

5               "The class-action device was designed as 'an *exception* to the usual rule that

6   litigation is conducted by and on behalf of the individual named parties only.'" *Gen. Tel. Co. of*

7   *the S.W. v. Falcon*, 457 U.S. 147, 155 (1982) (emphasis added; citation omitted).  Courts should

8   certify class actions only where homogeneity among the class members is such that the few can

9   fairly and adequately stand for the many, and where the device is the most effective and efficient

10  procedural tool. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 593 (1997) ("The dominant

11  concern of Rule 23(a) and (b) [is] that a proposed class have sufficient unity so that absentees can

12  fairly be bound by class representatives' decisions[.]").

13              Plaintiffs seek certification under Rule 23(b)(3), which requires that common

14  issues predominate over individualized issues ("predominance") and that class litigation is the

15  superior method of litigating the case ("superiority").  Fed. R. Civ. P. 23(b)(3); *Poulos v. Caesars*

16  *World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004).  Plaintiffs cannot establish either element.

17       **1.    Individualized issues predominate because there is no common proof
               that class members perform the same job duties.**
18

19              Rule 23(b)(3)'s predominance requirement tests whether the "proposed classes are

20  sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150

21  F.3d 1011, 1022 (9th Cir. 1998).  Let us assume that Plaintiffs and their five declarants accurately

22  recited their work.  Taking them at their word, the evidence shows profound, individualized

23  differences in how Representatives perform their jobs.  No one Representative or small group of

24  Representatives speaks for the whole.

25              *Plaintiffs'* evidence suggests that they and their five declarants perform, under

26  close supervision, predominantly clerical work that consists of rote data entry, copying and

27  pasting information, and pushing paper.  The other evidence, including from the 22 Declarants

28  and the Field Research survey of 151 current and former employees, shows that many class

- 17 -

members perform a very different job: investigating claims, analyzing information, setting reserves, reviewing and evaluating medical treatment, preparing plans of action, determining the settlement value of claims, negotiating settlements, and working with defense counsel. (Claim Rep. Decls.*; see, e.g.,* Huff ¶¶ 13, 20, 22, 25.) The Declarants work independently, and they delegate rote, clerical tasks. (Claim Rep. Decls.; *see, e.g.,* Schaffer ¶¶ 29, 31.)[10]

Further, even the Declarants' work varies. The percentage of work time they devote to the duties described in the declarations ranges from 60% to 100%. (*Compare* J. Williams ¶ 33 *with* Arnold ¶ 33.) The percentage of time they spend evaluating facts, and making choices and decisions based on those facts ranges from more than 50% to 100%. (*Compare* Ecker ¶ 31 *with* Belchamber ¶ 33.) The percentage of their claims that involve litigation range from 20% to 90%. (*Compare* Ecker ¶ 26 *with* Manage ¶ 26.) Some negotiate five settlement per year, while others negotiate 75 or more. (*Compare* Henry ¶ 26 *with* Wilson ¶ 23.) Some have negotiated settlements of up to $25,000, while others negotiate settlements worth hundreds of thousands of dollars. (*Compare* Werner ¶ 27 *with* Belchamber ¶ 27.)

These variations overwhelm any common issues, as many cases teach. In *Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229 (C.D. Cal. 2006), for example, the court denied a motion to certify a class of Assistant Store Managers. Wal-Mart, like Gallagher, had some standardized procedures. *Id.* at 236-40. While certain common questions existed, the court found "individual questions predominate over common issues" because "[b]y far the bulk of the evidence would pertain to individualized questions, including the work performed by each individual." *Id.* at 249.

In *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241 (C.D. Cal. 2006), similarly,

---

[10] Plaintiffs' contention that they perform clerical work raises other individualized issues. The Wage Order specifies that "exempt work shall include all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions." IWC Wage Order 4-2001 at §§ (1)(A)(2)(f). Otherwise routine, clerical work qualifies as exempt if it directly relates to, or facilitates, exempt duties. *See* 29 C.F.R. § 541.208 (2000) (identifying routine tasks that directly and closely relate to exempt tasks). Therefore, Plaintiffs' characterization of their work as "clerical" does not establish predominance of common issues or end the inquiry. On the contrary, it establishes the need to determine, for each class member, the relationship between so-called clerical tasks and other job duties.

1    the court denied certification of a class of managers. Noting variations in time spent on duties,

2    the court determined that "the question of the amount of discretion . . . is an individualized

3    inquiry not suitable for class certification." *Id.* at 252. It held "this is not the typical case where a

4    class can be certified because the class members' duties are, or can be determined to be, roughly

5    identical . . . . Here the variability goes to whether an individual class member has any claim at

6    all for misclassification." *Id.* at 253.

7              In *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476 (C.D. Cal. 2008), the court

8    decertified a class of supervisors, noting that "Plaintiff's evidence is essentially individual

9    testimony." *Id.* at 486. To maintain a class action, the plaintiff "had to provide common

10   evidence to support extrapolation from individual experiences to a class-wide judgment." *Id.*

11   Because common evidence did not show that all class members performed the same job duties,

12   "individualized issues predominate[d] over common ones." *Id.*[11]

13             California state courts have taken the same approach. In *Dunbar v. Albertson's,

14   Inc.*, 141 Cal. App. 4th 1422 (2006), the court affirmed the trial court's denial of class

15   certification in a case involving store managers. The plaintiff submitted declarations from class

16   members who stated they performed low-level tasks and argued that this evidence, coupled with

17   the company's treatment of all managers as exempt and the existence of uniform work rules,

18   demonstrated that common issues predominated. *Id.* at 1425-27. Albertson's submitted other

19   declarations from class members who stated they primarily performed managerial tasks. *Id.* at

20   1425. The court affirmed the trial court's ruling that common issues did not predominate over the

21   need to conduct individualized inquiries into the work performed by each class member. *Id.* at

22   1430, 1434.

23             In *Walsh v. IKON Office Solutions, Inc.*, 148 Cal. App. 4th 1440 (2007), the court

24
25   [11] *See also Nguyen v. BDO Seidman, LLP*, No. CV 07-01352, 2009 U.S. Dist. LEXIS 97524, at
     *16-24 (C.D. Cal. July 6, 2009) (denying certification based on "individualized questions as to
     disputed elements"; class members did not all perform the same duties, in the same way); *Pablo
26   v. ServiceMaster Global Holdings, Inc.*, No. C 08-03894, 2009 U.S. Dist. LEXIS 79584, at *15-18
     (N.D. Cal. Aug. 17, 2009) (denying certification of a class of inspectors; declarations from class
27   members revealed variations in how inspectors spend their workdays; individualized issues
     predominated because "the record does not support [plaintiffs'] assertion that all inspectors spent
28   at least half their workdays" performing the same tasks).

1   affirmed decertification of a class of account managers. Plaintiffs contended that class members

2   performed the same five core job duties. *Id.* at 1460. The court found, however, that "the manner

3   in which some account managers performed those tasks indicated their work was actually exempt

4   sales activity and not, as [plaintiffs] contended, nonexempt activities." *Id.* Individual issues

5   predominated; the determination of "whether the work is exempt or nonexempt . . . will require

6   consideration of each individual class member's particular work circumstances." *Id.*

7          *Keller v. Tuesday Morning, Inc.*, 179 Cal. App. 4th 1389 (2009), affirmed an order

8   decertifying a class of retail managers. The plaintiffs argued the company's training and

9   procedures were designed to ensure that all managers performed the same tasks, but class member

10  declarations showed that the amount of time employees spent performing managerial tasks ranged

11  from 10% of their workday to 100%. *Id.* at 1394-95. The trial court decertified the class. The

12  court of appeal affirmed because "individualized issues of liability . . . will predominate over

13  issues common to the class if the overtime claims are tried as a class." *Id.* at 1399.

14         Similarly, in *Ali v. U.S.A. Cab Ltd.*, 176 Cal. App. 4th 1333 (2009), the court

15  affirmed denial of certification in a case involving taxi drivers. The plaintiffs argued that a

16  standardized contract, training materials, and state and federal laws governing their activities

17  provided common proof of the degree of control the company exercised over their work. *Id.* at

18  1338-39. However, class member declarations showed variations in the amount of control the

19  company actually exercised. *Id.* at 1340. The trial court denied class certification. The court of

20  appeal affirmed, holding that the contrast between plaintiffs' description of their work and the

21  descriptions given by class members in declarations "amply support the finding" that individual

22  issues would predominate. *Id.* at 1349.

23         This case presents the same problem addressed by those courts. Even if the claims

24  of the Plaintiffs and their five declarants were fully credited, the evidence as a whole shows

25  material disparities in how Representatives do their jobs. Plaintiffs contend that all adjusters

26  perform the same types of tasks: conducting investigations, setting reserves, and approving

27  medical treatments. All that is true as far as it goes, but it is not the relevant inquiry. The issue is

28  *how* they do their work. Because the evidence shows material differences person to person, the

- 20 -

1     proposed class is not "sufficiently cohesive to warrant adjudication by representation." *Hanlon*,

2     150 F.3d at 1022.[12]

3              **2.**    **A class action is not "superior" under Rule 23(b)(3) because (i) a trial**
                    **over individuals' different job duties would be unmanageable, and**

4                     **(ii) class members have ample incentive to pursue claims.**

5           To certify a class, the Court must also find that a class action is "superior" to

6     individual suits. *Amchem*, 521 U.S. at 615. A class action is not superior here because

7     individualized inquiries over job duties would make a trial unmanageable, and individual class

8     members who wish to pursue claims have ample incentive to do so.

9                 **a.**    **A class-wide trial would be unmanageable.**

10          Plaintiffs' have not presented any common proof that would enable them to

11     extrapolate their unique experiences to all 441 class members. As Judge Pregerson explained in

12     *Marlo*:

13               Without more than this individual testimony, the Court cannot
              conceive how the overtime exemption will be presented to the jury

14               as a common issue for class-wide adjudication, as opposed to a
              number of individualized inquiries. There is a significant risk that

15               the trial would become an unmanageable set of mini-trials on the
              particular individuals presented as witnesses.

16

17     251 F.R.D. at 486. Without common proof, Plaintiffs cannot offer any workable plan for trying

18     this case on a class-wide basis. *Nguyen*, 2009 U.S. Dist. Lexis 97524, at *28 (class action not

19

---

20   [12] Plaintiffs can take no comfort in the cases where courts certified overtime classes, because
    those cases involved common evidence that class members performed the same, or very similar,

21   job duties, and in the same way. *See Whiteway v. FedEx Kinko's Office & Print Svcs. Inc.*, No. C
    05-2320, 2006 U.S. Dist. Lexis 69193, at *14 (N.D. Cal. Sept. 14, 2006) (differences among

22   class members' duties and responsibilities "appear to be minimal"); *Campbell v.*
    *PricewaterhouseCoopers LLP*, 253 F.R.D. 586, 604-05 (E.D. Cal. 2008) (denying certification of

23   proposed class that included jobs with "significant differences in the work performed," but
    granting certification of subclass comprised of employees with similar duties); *Tierno v. Rite Aid*

24   *Corp.*, No. C 05-02520, 2006 U.S. Dist. Lexis 71794, at *16 (N.D. Cal. Aug. 31, 2006) ("Store
    Managers perform essentially the same tasks at each store."); *Sav-On Drug Stores, Inc. v.*

25   *Superior Court*, 34 Cal. 4th 319, 330-31 (2004) ("as plaintiffs argued to the trial court, '[t]he only
    difference between Defendant's declarations and Plaintiffs' evidence is that the parties disagree

26   on whether certain identical work tasks are 'managerial' or 'non-managerial'"); *cf. Alba v. Papa*
    *John's USA, Inc.*, No. CV 05-7487, 2007 U.S. Dist. LEXIS 28079, at *4 (C.D. Cal. Feb. 7, 2007)

27   (certifying class where defendant enacted a "written, company-wide policy effectively stripping
    the store managers of discretionary authority in the performance of their duties"). In contrast, the

28   evidence here shows significant variations in the work performed by putative class members.

superior where "given the predominance of the individual issues . . . adjudication of claims on a class-wide basis would amount to the adjudication of each of the claims on an individual basis"); *Jimenez,* 238 F.R.D. at 253 ("trial of this case as a class action would be unmanageable because of the individualized inquiries required").

**b.      Class members who wish to pursue individual claims have ample incentive to do so.**

During the limitations period, Claim Representatives earned, on average, $58,337 per year, and Senior Claim Representatives, on average, $69,695 per year. (Woods ¶ 3.) Because their salaries translate to hourly pay rates of $28.00 and $33.50, each employee could win tens of thousands of dollars by prevailing on an individual claim. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1191 (9th Cir. 2001) (potential for class members to recover sizable damages mitigates against class certification). They also would obtain prevailing-party attorney's fees if they did so. *See Matthews v. Book-Of-The-Month Club, Inc.,* 62 F.R.D. 479, 479 (N.D. Cal. 1974) ("statutory penalties, including attorneys' fees, are a substitute, in vindicating the rights of the small litigant, for the class action device").

Therefore, this is not a case of "class action or no action"; any worthy claim still can be vindicated, even upon denial of certification.

**D.      Plaintiffs' Arguments Are Without Merit.**

**1.      A so-called administrative-production dichotomy does not make the case proper for certification.**

Plaintiffs' proposed expert, Miles Locker, contends that an "administrative-production dichotomy" makes the case appropriate for certification.[13] He cites *Bell v. Farmers Ins. Exch.*, 87 Cal. App. 4th 805 (2001) and two Department of Labor Standards Enforcement opinion letters in support. *(Id.)*[14] Contrary to Locker's "declaration," insurance adjusters who

---

[13] Gallagher in an accompanying motion to strike demonstrates that Locker's "declaration" does not present proper factual material at all, but rather additional legal argument in violation of this Court's page-limitation rules.
[14] Locker also improperly cites another case in which the California Supreme Court granted review of the decision and depublished it. *See Harris v. Superior Court*, 68 Cal. Rptr. 3d 528 (2007), *granting review*, No. S156555. That case is not properly citable "in any other action." Cal. R. Ct. 8.1115(b).

- 22 -

1    perform more than "routine and unimportant" job duties qualify as exempt administrative

2    employees because their work is "directly related to the general business operations of the

3    employer or the employer's customers." *See* I.W.C. Wage Order 4-2001, § 1(A)(2).

4         **a. The so-called "dichotomy" does not apply.**

5        Locker argues that adjusters who work for an insurance company necessarily

6    perform "production," as opposed to "administrative," work. The authorities he cites do not

7    support this conclusion. Instead, exempt status turns on whether an adjuster performs more than

8    "routine and unimportant" work.

9        In *Bell*, the court held that a particular group of claims adjusters did not qualify for

10   the administrative exemption. 87 Cal. App. 4th at 826. The court described the dichotomy as a

11   "somewhat gross distinction that may not be dispositive in many cases," and acknowledged that

12   courts should use "great caution" in resolving cases "on the basis of such a broad distinction." *Id.*

13   at 827-28. However, the court found the dichotomy determinative in that particular case because

14   those adjusters performed "routine and unimportant" duties that fell "squarely on the production

15   side" of Farmers' business. *Id.* at 827-28.

16       Later, the same case again came before the court of appeal. *Bell v. Farmers Ins.*

17   *Exch.*, 115 Cal. App. 4th 715, 730 (2004). The court declined to reconsider its earlier decision,

18   but emphasized that its opinion "was based on the restricted record before us and cannot be read

19   out of that context." That record, the court explained, showed that those claims representatives

20   "processed a large number of small claims and, according to FIE's own characterization, their

21   duties were restricted to the 'routine and unimportant.' We concluded that these work activities

22   'place[d] plaintiffs in the sphere of rank and file production workers[.]'" *Id.*

23       The Ninth Circuit has questioned whether *Bell* was correctly decided, even as thus

24   limited. *In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119,

25   1132 (9th Cir. 2007) (*Bell* "overlooked" relevant law and "elevate[d] form . . . over substance").

26   And recent decisions have declined to apply the dichotomy when (unlike in *Bell*) the work at

27   issue is *not* "routine and unimportant." For example, *Combs v. Skyriver Communications, Inc.*,

28   159 Cal. App. 4th 1242, 1258 (2008), affirmed a trial court's order granting judgment for the

- 23 -

1  employer. The trial court had declined to apply the dichotomy in a case involving a network

2  administrator, holding that it was not a mandatory test. *Id.* at 1251. The court noted that *Bell*

3  factually and legally differed because, according to the *Bell* employer's own characterization, the

4  adjusters' "job responsibilities were restricted to the 'handling of the routine and unimportant.'"

5  *Id.* at 1259.

6         As *Combs* noted, *Bell* itself "strongly admonished" that the dichotomy "may not

7  be dispositive in many cases involving a claim of administrative exemption, and in fact warned

8  that the dichotomy should be applied with great caution." *Id.* at 1260. A recent federal case

9  (applying California law) said the same thing and declined to apply the dichotomy, noting it is "of

10 limited use outside of the manufacturing context in which it was devised." *Heffelfinger v. Elec.*

11 *Data Sys. Corp.*, 580 F. Supp. 2d 933, 956 (C.D. Cal. 2008); *see also Bothell v. Phase Metrics,*

12 *Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002) (the dichotomy "should only be employed as a tool

13 towards answering the ultimate question [of whether an employee performs administrative work],

14 not as an end in itself").[15]

15        b.    **Even if Locker were correct that the so-called dichotomy**
              **applied to Representatives' work for Gallagher *itself*, it does not**
16            **apply to their work for Gallagher's *clients*.**

17        Employees separately qualify for the administrative exemption if their work

18 directly relates to the management policies or general business operations of their employer's

19 _____

20 [15] The DLSE opinion letters cited by Locker are "not entitled to deference and [do] not have the
   force of law." *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 324 (2005). If anything, though,
21 they support the conclusion that the exemption depends on the importance of an employee's
   work. The October 5, 1998 opinion letter notes "a determination as to whether an employee or
22 group of employees are exempt or non-exempt from overtime provisions requires a thorough
   investigation as to the actual work performed by the employee(s). This is a fact intensive
23 inquiry[.]" DLSE Op. Ltr. 1998.10.05, p. 2. Further, to the extent that the 1998 opinion suggests
   that adjustors for an insurance company cannot perform administrative work, a later opinion letter
24 qualified that conclusion. The DLSE's 2003 opinion noted that the *Bell* court "analyzed the
   significance of the work performed by the claims representatives, and concluded their
25 responsibilities were 'restricted to the routine and unimportant' . . . . Thus, the activities of these
   employees did not constitute 'work of substantial importance to the management or operation of
26 the business . . .' within the meaning of 29 CFR § 541.205(a)." DLSE Op. Ltr. 2003.05.23, p. 10.
   Concluding that business agents of a union performed "administrative" work, even though they
27 provided the very service their employer existed to provide, the opinion states "application of the
   dichotomy in isolation, without consideration of its purpose as an analytical tool, could lead to the
28 erroneous conclusion that every employee . . . of a company that provides other businesses with
   management or administrative services is a 'production employee'[.]" *Id.* p. 13.

*customers*. *See* I.W.C. Wage Order 4-2001, § 1(A)(2)(a)(i); 29 C.F.R. § 541.205(d) (2000) ("the 'management policies or general business operations' may be those of the employer *or the employer's customers*") (emphasis added). Indeed, in a 2005 opinion letter, the Department of Labor advised that employees who adjust workers' compensation claims for a third-party administrator perform "administrative" work because they "service the employer's customer's business through the performance of claims adjusting duties." DOL Op. Letter FLSA2005-25 (Aug. 26, 2005). (RJN, Ex. B.)

Locker does not squarely address this separate element of the exemption. Yet it is critical to the analysis because, even if there were common proof that class members performed production work *as to Gallagher*, Plaintiffs' have presented no common proof that putative class members performed production work *as to Gallagher's clients*, who outsource to Gallagher their claims-adjusting functions. That determination necessarily would involve a Representative by Representative and client by client inquiry.

      2.    **No common policies or practices limit the discretion and independent judgment exercised by Gallagher's Representatives.**

Plaintiffs assert that California workers' compensation law, and Gallagher's client service instructions, "Best Practices" manual, and "chain of command" deprive putative class members of discretion and independent judgment. As described below, however, none of these constrain, let alone place uniform constraints on, class members' ability to make their own decisions about how best to handle each claim.

      a.    **California workers' compensation law does not foreclose the exercise of discretion and independent judgment.**

Plaintiffs claim that workers' compensation law deprives all Representatives of the ability to exercise discretion and independent judgment. They are incorrect.

First, Plaintiffs' argue that "the decision to pay Workers' Compensation benefits is strictly dictated by the California Labor Code." (Mot. 13:5-7.) However, as described in Sections II.D. above, putative class members analyze information to determine whether or not to deny claims, investigate the possibility of fraud and subrogation, and make recommendations

- 25 -

concerning these topics that supervisors and clients "often" or "always" follow.[16] The proper result does not directly follow from "the law."

Second, Plaintiffs cite the Labor Code's time limitations for reporting claims and paying benefits. These deadlines, however, explain only *when* the decisions should be made, not what the decisions should be or who should make them.

Finally, Plaintiffs cite training that the law requires Representatives to receive. (Mot. 13:24-26.) Educational coursework, however, *helps inform* how discretion and independent judgment is exercised. Nothing in the coursework supplies cookie-cutter solutions to the multitude of issues that Representatives face or otherwise dispenses with discretion and independent judgment. (*See* Ponta ¶ 6.)

In sum, Plaintiffs' reliance on workers' compensation law is misplaced. *See, e.g., McAllister v. Transam. Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003) (requirement that adjuster comply with the law has no bearing on discretion and independent judgment).

**b.     Client-service instructions do not foreclose the exercise of discretion and independent judgment.**

Although client-service instructions require Gallagher sometimes to obtain the client's approval before expending the client's money, they do not tell adjusters how to resolve a claim — or what decision to reach for any aspect of a claim. (*See* Ponta ¶ 9, Exs. A, B.)[17] Plaintiffs admitted in deposition that their client-service instructions did *not* tell them what conclusions to reach, or dictate the decisions they made. (Archer Dep. 24:3-7; 172:16-173:10; Ex. 9; Carey Dep. 39:6-18; 173:9-175:16; Ex. 5; Keshishzadeh Dep. 22:18-22; 141:14-142:2;

---

[16] Plaintiffs often, as here, stress that adjusters need to seek approval for certain decisions. They fail to mention, however, that: (i) the formation of the recommendations themselves requires the collection and analysis of facts, and (ii) California law identifies recommendations as consistent with the exercise of discretion and independent judgment. See Sections II.D-E and III.B.2 above.
[17] Gallagher has moved to strike Plaintiffs' "summary" of client-service instructions because it grossly misstates the contents of the instructions it purports to summarize. Plaintiffs have misstated other evidence as well. For example, Plaintiffs' brief quotes company representatives Chris Neigel and Jeff Ponta as stating that the "actual 'role' of the WC Claims Rep was and still is uniformly 'to apply well-established techniques, procedures, and standards described in the Defendants' manuals to the workers' compensation claims of the Defendants' clients as established by the Defendants." (Mot. 8:3-6.) What Neigel and Ponta *actually* said is that Claim Representatives and Senior Claim Representatives "*have the authority*" to apply techniques, procedures, and standards. (Neigel Dep. 152:21-153:8; Ponta Dep.188:14-22.)

- 26 -

1   Exs. 13-14.)  Similarly, Gallagher's twenty-two Declarants confirm that their service instructions

2   do not dictate the decisions or recommendations they make when adjusting claims.  (See Claim

3   Rep. Decls.)

4           Moreover, the service instructions for Gallagher's clients are not "standardized."

5   They vary from client to client, depending on each client's contract with Gallagher.  (Ponta ¶ 9,

6   Ex. C.)  Even if one client's instructions "constrained" *its* Representative in the manner Plaintiffs

7   claim, that "constraint" is client-specific, not representative of any other client (or its

8   Representative).  (*Id.*)  Therefore, the service instructions if anything represent an additional

9   source of differences among Representatives.

10                 **c.**    **The "Best Practices" do not foreclose the exercise of discretion
11   and independent judgment.**

12           Gallagher's Best Practices, like client-service instructions, do not tell adjusters

13   *how* to adjust any particular claim, what conclusions to reach, or what strategies and tactics they

14   should use to resolve a claim.  They contain deadlines and reporting requirements, but leave the

15   Representative free to make decisions.  For example:

16       •    Investigation:  They ask adjusters to interview relevant witnesses within

17              certain timeframes, but do not tell adjusters how to investigate or what

18              conclusions to draw from those investigations.  (Ponta ¶ 7, Ex A,  p. D-

19              01182-83; Ex. B, p. D-00432-33; *see also* Keshishzadeh Dep. 32:18-20

20              (her job to determine what information she needed to resolve a claim);

21              Carey Dep. 29:16-19 (same))

22       •    Reserves:  They ask adjusters to independently calculate reserves, and

23              update reserves, based on "pertinent information in the file," and do not

24              require adjusters to accept MIRA estimates.  (Ponta ¶ 7. Ex. A, p. D-

25              01184-85; Ex. B, p. D-00434-35.)[18]

---

26   [18] Plaintiffs' proposed expert, Joe Lavitt, asserts that Representatives rely on MIRA to set
reserves. Lavitt, however, was uninformed, not only of Gallagher's operations, but the facts and
27   indeed the law more generally. Lavitt admitted that he: (1) does not know if he applied any
recognized standard for determining exempt status in his report (Lavitt Dep. 51:2-10. Ex. 3); (2)
28   has never seen the California test for the administrative exemption, or read the Wage Order that

- 27 -

- <u>Independent Medical Exams/Second Opinions</u>:  They indicate that second opinions "are normally conducted to determine either ability to return to work, extent of permanent disability, or need for and type of additional treatment," but do not dictate when a review of those issues is necessary, or even advisable.  (*Id.* Ex. A, p. D-01186; Ex. B, p. D-00436.)

- <u>Subrogation</u>:  They ask adjusters to investigate "every claim involving potential subrogation," but to obtain the client's approval before pursuing a subrogation claim because the client "may have valid reasons for not wanting to pursue a third party."  (*Id.* Ex. A, p. D-01187; Ex. B, p. D-00437.)

- <u>Settlement</u>:  They state that "[w]here the claimant is not represented by counsel and state law allows, we can negotiate directly with the claimant.  Where required by law, negotiations will be conducted by legal counsel under our direction.  Where applicable, authority/approval must be obtained from the client/carrier prior to settlement."  (*Id.* Ex. A, p. D-01188; Ex. B, p. D-00438.)  No provision tells adjusters whether to settle a particular claim, when to settle, what the settlement value should be, or how to negotiate the settlement.  (*Id.*)[19]

---

sets forth the element of the exemption (*id.* at 51:11-21, Ex. 19); (3) applied his own definition of "discretion and independent judgment" in the report, and has no familiarity with the actual definition under California law (*id.* at 51:11-21; 66:2-67:8; 68:24-69:21; 72:23-73:2; Exs. 19-20); (4) applied his own definition of "matters of significance" in his report, and has no familiarity with the actual definition under California law (*id.* at 51:11-21; 66:2-67:8; 72:23-73:6; Exs.19-20); (5) does not believe that Plaintiffs had authority to perform tasks that they testified under oath they could and did perform (*id.* at 96:14-99:8; 100:22-101:13; 166:16-21; 186:8-21; 191:25-192:18; 198:6-13); (6) relied on excerpts of deposition testimony provided by Plaintiffs' counsel which omitted Plaintiffs' admissions that Gallagher's Best Practices and client-service instructions did not dictate the decisions they made or conclusions they reached when they adjusted claims (*id.* at 101:20-104:4; 107:6-108:5; 111:20-114:4; 145:12-146 :7; 153:6-154:15; 155:12-157:10; 159:17-160:22; 168:18-24; 188:20-25); and (7) did not know that Gallagher disciplined and/or terminated any of the Plaintiffs or declarants for poor performance (other than Carey) (*id.* at 83:19-84:8; 85:10-15).

[19] Lavitt misquotes the Best Practices by asserting that they only permit supervisors or branch managers to direct or control litigated claims.  (Lavitt Report., pp. 15, 22.)  What the Best Practices *actually* say is that "The Branch Manger, Supervisor *or Claim Representative* will, at all times, direct and control the claim."  (Ponta ¶ 7, Ex. A, p. D-01186-87 (emphasis added).)  The 2008 Best Practices similarly state only that "The *Claim Representative* Supervisor, or Branch

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY CLASS ACTION

- _Plans of Action/File Direction_:  They ask adjusters to develop a "plan for future handling [of each claim] through conclusion" and to indicate their "thought process" and the "direction the file is taking."  (_Id._ Ex. A, p. D-01191; Ex. B, p. D-00441.)

During their depositions, all three Plaintiffs admitted that the Best Practices did _not_ dictate the result of any claim.  Plaintiff Carey, for example, admitted that the Best Practices did not tell him what conclusions to reach with regard to a claim, what decisions to make when he adjusted claims, whether to accept or deny a particular claim, what reserve to set for a claim, whether a client should pursue subrogation, what plan of action to develop for resolving a claim, whether to challenge a medical provider's opinion through the AME or QME process, whether to retain a defense attorney in a particular case, how much a claim should settle for, or how to negotiate a settlement.  (Carey Dep. 173:9-175:16; Ex. 2.)  Plaintiff Archer admitted that the Best Practices did not tell her what conclusions to reach when she adjusted claims, whether to accept or deny a particular claim, what decisions to make about the settlement value of claims, how to evaluate defense attorneys' litigation plans, whether to settle a particular claim or challenge it at a hearing, or whether to challenge a medical provider's opinion through the AME or QME process.  (Archer Dep. 168:1-11; 169:4-18; 170:14-171:13; Ex. 4.)  Plaintiff Keshishzadeh similarly admitted that the Best Practices did not tell her what conclusions to reach when she adjusted claims.  (Keshishzadeh Dep. 140:21-141:4; Ex. 4.)

In addition, the 22 Declarants confirm that the Best Practices outline the timeline for completing certain tasks, and describe reporting requirements, but do not determine what decisions or recommendations to make when adjusting claims or the strategies used to resolve claims.  (Claim Rep. Decls.; _see, e.g._, Huff ¶ 11.)  The Declarants refer to the Best Practices infrequently, and confirm that no document or policy dictates the conclusions they reach when they adjust claims.  (_Id._ at ¶ 12.)  Instead, they make their own determinations about

---

Manager will at all times direct and control the claim."  (_Id.;_ Ex. B, p. D-00436-37 (emphasis added).)  Plaintiffs themselves admitted that they were responsible for overseeing the work of defense attorneys on litigated cases.  (Keshishzadeh Dep. 48:10-49:5; 120:20-122:21; Carey Depo, 148:21-24; 150:15-151:4; 151:21-152:3; Archer Dep. 129:7-130:11; 131:2-16.)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY CLASS ACTION

compensability, reserves, settlements, medical treatment, litigation strategy, and other matters, based on the facts of each particular claim.[20]  (*Id.*)

The instant case resembles others in which plaintiffs have cited a company's suggested procedures as inconsistent with exempt status.  The cases reject the notion that exempt status requires employee anarchy.  *Donovan v. Burger King*, 675 F.2d 516 (2d Cir. 1982), is the leading case.  In that case, the court rejected a claim that uniform procedures foreclosed discretion and independent judgment:

> We fully recognize that the economic genius of the Burger King enterprise lies in providing uniform products and service economically in many different locations and that adherence by Assistant Managers to a remarkably detailed routine is critical to commercial success.  The exercise of discretion, however, even where circumscribed by prior instruction, is as critical to that success as adherence to "the book."  Burger King, of course, seeks to limit likely mistakes in judgment by issuing detailed guidelines, but judgments must still be made.

*Id.* at 521-22.

Thus, the use of manuals, guidelines, or estimating software as aids does not supply common proof of non-exempt status where it does not eliminate the need to exercise judgment. *Cheatham*, 465 F.3d at 585 ("the requirement that Allstate adjusters must consult with manuals or guidelines does not preclude their exercise of discretion and independent judgment"); *McAllister*, 325 F.3d at 1001 ("McAllister claims she had no discretion to disregard state law or the claims manuals, but she focuses on the wrong issue."); *In re Farmers Inc. Exch.*, 466 F.3d at 862 ("the use of computer software to estimate claims does not eliminate the need for discretion and independent judgment any more than does resort to other reference works"); *Blue v. Chubb Group*, No. 03-C-6692, 2005 U.S. Dist. LEXIS 14253, at *51-52 (N.D. Ill. Jul. 13, 2005) (workers' compensation adjuster's use of "Best Practices" to adjust claims is "insufficient to deprive [her] of exempt administrative duties").

---

[20] Plaintiffs' expert, Lavitt, cites the Best Practices' reference to "templates [and] form letters" for certain communications.  (Lavitt Report, pp. 3, 15-16, 18.)  However, the Best Practices do not specify who must perform those tasks.  As described in Section II.D.10, putative class members can, and frequently do, delegate to Claims Assistants the task of preparing form letters.

### d.   The "chain of command" does not foreclose the exercise of discretion and independent judgment.

Plaintiffs also identify Gallagher's "chain of command" as a limit on discretion and independent judgment. The same response applies:  Employees need not work free from supervision to maintain their exempt status, so it supplies no common proof of Plaintiffs' claims.

Here is the body of evidence on the issue of supervision.  Both Plaintiffs and Declarants confirm that (i) supervisors typically review their claims 30 days after they are assigned, and thereafter every 90 days;[21] and (ii) by the time of the initial 30-day review, they have already conducted an investigation, set reserves, prepared a plan of action, and paid benefits on claims they decided to approve.  (Carey Dep. 168:8-169:15; 170:23-171:1; Keshishzadeh Dep. 137:13-25; 138:16-139:4; Archer Dep. 156:14-157:23; 166:1-13; Claim Rep. Decls.; *see, e.g.,* Schaffer ¶ 29.)

Plaintiffs note that Gallagher's Claims Supervisors supervise, on average, "between 3 to 10" subordinates.  (Mot. 18:6-7.)  If anything, this statistic suggests that the level of supervision varies greatly from person to person and office to office.  Furthermore, Plaintiffs admitted that they handled between 90 and 160 claims at any one time, and four supervisors confirmed in declarations that the adjusters they oversee handle anywhere from 130 to 165 claims.  (Carey Dep. 15:1-7; Keshishzadeh Dep. 22:23-23:2; Archer Dep. 24:8-16; Dee ¶ 8; S. J. Williams ¶ 8.)  Thus, if a supervisor manages between 3 and 10 Representatives, the supervisor is responsible for anywhere from a several hundred to 1,000 or more claims simultaneously — undercutting any assertion that a supervisor can micromanage.  Not surprisingly, many Declarants reported that they work independently and are not closely supervised, and supervisors confirm that they do not and cannot closely supervise each claim.  (Claim Rep. Decls; *see, e.g.,* Nava ¶ 29; Supervisor Decls. (attached as Exhibit B. to Hutton Decl.); *see, e.g.,* S. Williams ¶ 8; Dee 8; Wilkenfeld ¶ 30; Brown ¶ 30.)[22]

---

[21] Archer, on the other hand, testified that her supervisor typically conducted an initial review within five days.  (Archer Dep. 166:1-9.)  To the extent that difference is meaningful, if anything it underscores the absence of class-wide uniformity.

[22] Plaintiffs' evidence to the contrary is an *unsigned* "declaration," purportedly from a former supervisor named Kevin Roberts.  As explained in Gallagher's objections to evidence, the

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY CLASS ACTION

1    Even Plaintiffs' own testimony belies common issues.  Keshishzadeh admitted, for

2    example, that she could set reserves of up to $25,000 without a supervisor's approval.

3    (Keshishzadeh Dep. 89:3-5.)  Archer admitted that she could set reserves of up to $150,000 with a

4    supervisor's approval.  (Archer Dep. 112:1-7.)  Carey admitted that he never needed a

5    supervisor's approval to set reserves.  (Carey Dep. 130:16-24.)  As for settlements, Keshishzadeh

6    claimed that she needed a supervisor's approval for all settlements (Keshishzadeh Dep. 104:19-

7    21), but Archer testified that she could negotiate settlements of up to $50,000 without a

8    supervisor's approval (Archer Dep. 119:8-18) and Carey testified that he does not know whether

9    he needed a supervisor's approval for any settlement (Carey Dep. 140:24-141:13).  The

10   Declarants circumstances similarly differ.  (*Compare* Couchot ¶ 27 *and* Clifford ¶ 25 *with* Arnold

11   ¶ 27 *and* Ashby ¶ 25.)  Furthermore, even when Representatives need a supervisor's approval to

12   set a reserve or settle a claim, most putative class members make recommendations that their

13   supervisors "often" or "always" approve.  (Jay Decl ¶ 2. Ex. A, pp. 3, 26-32.)[23]

14   Plaintiffs' argument reduces itself to the assertion that supervisors supervise.  Of

15   course they do, but that does not divest all Representatives of the need to exercise discretion and

16   independent judgment in making decisions and persuasive recommendations.

17   **3.   Gallagher has not asserted an "advice of counsel" defense.**

18   Plaintiffs falsely accuse Gallagher of asserting an advice of counsel defense that

19   allegedly waived its right to defend against their claims.

20   The advice of counsel defense does not even apply to overtime claims.  *Marshall*

21   *v. Union Pac. Motor Freight Co.*, 650 F.2d 1085, 1092 (9th Cir. 1981) (advice of counsel not a

22   defense to overtime claims under the FLSA, even where plaintiff alleges "willful" violation).

23   Moreover, Gallagher has never asserted advice of counsel as a defense.  Rather, it consistently

24   ———————————————————————————————————————————

25   unsigned declaration is inadmissible.  Moreover, four other supervisors have averred that the
     employees they supervise perform very different duties under minimal supervision. (S. Williams
     ¶ 8; Dee ¶ 8; Harris ¶ 8; Marks ¶ 8.)

26   [23] Plaintiffs cite periodic audits conducted by managers and corporate personnel.  Branch
     Managers review approximately 40 files per month, and corporate personnel conduct audits of

27   each branch every one to two years. (Ponta ¶ 8.)  The audits are conducted only after the fact,
     *after* Representatives have taken action on a claim (*id.*), so axiomatically the audits cannot

28   constrain adjusters' ability to make decisions in real time.

1    has asserted that the job duties of Representatives qualify them for the administrative exemption.

2    (*See* Answer to First Amended Consolidated Complaint, No. 67.)

3           Plaintiffs contend that, during his deposition, a company representative refused to

4    disclose attorney-client privileged communications about the decision to classify Representatives

5    as exempt. (Neigel Dep. 38:8-39:15; 46:24-49:13.)  However, Gallagher did not adopt an advice

6    of counsel defense, or somehow waive its right to oppose class certification, by refusing to

7    disclose privileged communications.  If Plaintiffs believed the instruction not to answer based on

8    privilege was improper, they should have moved to compel further answers — something that

9    Plaintiffs did not do.  They have no grounds now to object to the completeness of the deposition,

10   let alone to characterize the invocation of attorney-client privilege as a waiver of a substantive

11   defense.

12          **4.    A "policy" of classifying employees as exempt does not warrant class**
                    **treatment.**

13

14          The Ninth Circuit has explicitly rejected Plaintiffs' argument that a common

15   practice of classifying employees as exempt warrants certification.  In *In re Wells Fargo Home*

16   *Mortgage,* 571 F.3d 953 (9th Cir. 2009), the Ninth Circuit held that a trial court abused its

17   discretion by finding that "Rule 23(b)(3)'s predominance requirement was met based on Wells

18   Fargo's internal policy of treating all [class members] as exempt."  The court stated:

19                 [U]niform corporate policies will often bear heavily on questions
                   of predominance and superiority . . . But Wells Fargo's blanket
20                 application of exemption status, whether right or wrong, is not
                   such a rule.  In contrast to centralized work policies, the blanket
21                 exemption policy does not to facilitate common proof on the
                   otherwise individualized issues.
22

23   *Id.* at 958-59; *see also Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935, 947 (9th Cir.

24   2009) ("focusing on a uniform exemption policy alone does little to further the purpose of rule

25   23(b)(3)'s predominance inquiry, which requires an assessment of the relationship between

26   individual and common issues"); *Campbell v. PricewaterhouseCoopers LLP,* 253 F.R.D. 586,

27   603 (E.D. Cal. 2008) ("The fact that an employer classifies all or most of a particular class of

28   employees as exempt does not eliminate the need to make a factual determination as to whether

- 33 -

1   class members are actually performing similar duties.").[24]

2   ### 5.   The Private Attorneys General Act claim does not dispense with the
3        Rule 23 analysis.

4   Plaintiffs' incorrectly state that they need not meet the standards of Rule 23 in

5   order to maintain their Private Attorney Generals Act ("PAGA") claim.  Courts sitting in diversity

6   jurisdiction apply federal law to the claims before them.  *See, e.g., Gasperini v. Center for*

7   *Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("[F]ederal courts sitting in diversity apply state

8   substantive law and federal procedural law.").  Given that PAGA is a procedural statute, the

9   Court must apply Rule 23.  *See Amalgamated Transit Union, Local 1756 v. Superior Court*, 46

10  Cal. 4th 993, 1003 (2009) (PAGA is "simply a procedural statute" allowing an employee to

11  recover civil penalties for Labor Code violations).

12  Moreover, in order to obtain relief under PAGA, Plaintiffs must prove Labor Code

13  violations for *every* individual for whom they wish to recover civil penalties.  *See, e.g., Hibbs-*

14  *Rines v. Seagate Techs., LLC*, No. C-08-05430, 2009 U.S. Dist. LEXIS 19283, at *11 (N.D. Cal.

15  Mar. 2, 2009) (plaintiff must prove that defendant violated the Labor Code for "each and every"

16  purported "aggrieved employee" in order to collect PAGA penalties).  Therefore, Plaintiffs still

17  must prove their allegations on a class-wide basis — as they would under Rule 23.  The Court

18  should apply the same standards to Plaintiffs' PAGA claim as to Plaintiffs' Labor Code claims.

19  ## IV.   CONCLUSION

20  For all of the reasons set forth above, the Court should deny class certification.

21

22

23

24

---

25  [24] In *Heffelfinger v. Elec. Data Sys. Corp.*, No. CV-07-00101, 2008 U.S. Dist LEXIS 5296, at
    *103-04 (C.D. Cal. Jan. 7, 2008) and *Jaimez v. Daiohs USA, Inc.*, No. B209486, 2010 Cal. App.
26  LEXIS 156, at *29-30 (2nd Dist. Jan. 12, 2010), the courts relied on the employer's uniform
    classification of employees as exempt to certify the class.  The Ninth Circuit in *In re Wells Fargo*
27  *Home Mortgage* rejected this reasoning because an exemption policy does not provide common
    proof of how employees actually spend their work time.  571 F.3d at 959; *see also Vinole,* 571
28  F.3d at 947.

- 34 -

1  DATED:  February 16, 2010

Respectfully submitted,

2

PAUL, HASTINGS, JANOFSKY & WALKER LLP

3

4

By:_____ /s/ M. Kirby C. Wilcox
                              M. Kirby C. Wilcox

5

Attorneys for Defendants,

6  ARTHUR J. GALLAGHER SERVICE CO.,
   ARTHUR J. GALLAGHER & CO. and

7  GALLAGHER BASSETT SERVICES, INC.

8

9  LEGAL_US_W # 63721448.7

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY CLASS ACTION