1  **BLUMENTHAL, NORDREHAUG & BHOWMIK**
   Norman B. Blumenthal (State Bar #068687)
2  Kyle R. Nordrehaug (State Bar #205975)
   Aparajit Bhowmik (State Bar #248066)
3  2255 Calle Clara
   La Jolla, CA 92037
4  Telephone: (858)551-1223
   Facsimile: (858) 551-1232
5  Email: norm@bamlawlj.com

6  Attorneys for Plaintiffs
   *Additional Attorneys Listed on Signature Page*
7

8

9                **UNITED STATES DISTRICT COURT**

10              **SOUTHERN DISTRICT OF CALIFORNIA**

11

12 | SCARLET KESHISHZADEH and LISA | Case No. **09-cv-0168 LAB (RBB)** |
   ARCHER, as individuals, on behalf of

13 themselves, and on behalf of all persons        **MEMORANDUM OF POINTS AND**
   similarly situated,                             **AUTHORITIES IN SUPPORT OF**
14                                                 **MOTION TO CERTIFY CLASS ACTION**
                 Plaintiffs,
15         vs.                                     Judge:        Hon. Larry A. Burns
                                                   Court No.:    9 (2nd Flr.)
16 ARTHUR J. GALLAGHER SERVICE CO.,
   a Delaware Corporation                          Hearing Date: March 15, 2010
17                                                 Hearing Time: 11:15 a.m.
                 Defendants.
18 ─────────────────────────────

19 JAMES CAREY, on behalf of himself and all
   others similarly situated,
20
                 Plaintiffs,
21         vs.

22 ARTHUR J. GALLAGHER AND
   COMPANY, a Delaware Corporation, and
23 GALLAGHER BASSETT SERVICES, INC.,
   a Delaware Corporation, inclusive,
24               Defendants.

25

26

27

28

───────────────────────────────────────────────
**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

# **TABLE OF CONTENTS**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    COMMON QUESTIONS OF FACT PREDOMINATE . . . . . . . . . . . . . . . . . . . . . . 4

            1.    The Common Evidence Proves That All WC Claims Reps Were
                  Uniformly Classified as Exempt by Defendants Based on
                  Job Title Alone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            2.    Common Evidence Will Prove That Defendants Required Each WC
                  Claims Rep to Perform the Same Tasks . . . . . . . . . . . . . . . . . . . . . . . . . 8

            3.    Common Evidence Will Prove That The Tasks Primarily Performed by
                  All the WC Claims Reps as Required by Defendants Were Data Intake,
                  Data Entry and Data Communication Using the Defendants'
                  Standardized Format . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            4.    Common Evidence Will Prove That All Claims Reps Work on the
                  Production Side of Defendants' Business . . . . . . . . . . . . . . . . . . . . . . . 10

            5.    Common Evidence Will Prove That Each Individual File the WC Claims
                  Reps Processed Was Insignificant to Defendants' Business . . . . . . . . . . . 11

            6.    Common Evidence Will Prove That Defendants Uniformly Required the
                  WC Claims Reps to Follow the Law, Client Servicing Instructions and
                  Best Practices Guide under a Standardized Format Pursuant to Which
                  They Could Not Exercise Independent Judgment or Discretion
                  as to Any Matters of Significance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                  a.    Compliance with California Law . . . . . . . . . . . . . . . . . . . . . . . . 13

                  b.    Compliance with the Clients' Servicing Instructions . . . . . . . . . . 14

                  c.    Compliance with Best Practices Guide . . . . . . . . . . . . . . . . . . . . 15

      B.    COMMON EVIDENCE WILL ESTABLISH DEFENDANTS' CHAIN OF
            COMMAND AND CONTROL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            1.    Claims Supervisors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            2.    Branch Managers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            3.    Corporate Audits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.    CERTIFICATION STANDARD UNDER RULE 23 . . . . . . . . . . . . . . . . . . . . . . . 19

B.   SUBSTANTIVE STATE LAW APPLIES TO CERTIFICATION OF THE CLAIMS HERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.   STANDARD FOR CERTIFICATION OF OVERTIME WAGE ACTIONS . . . . . 21

D.   THIS ACTION MEETS THE REQUIREMENTS OF RULE 23(a) . . . . . . . . . . . 24

   1.   Numerosity of the Class Makes Joinder Impractical . . . . . . . . . . . . . . . . . . 24

   2.   Common Questions of Law and Fact Exist . . . . . . . . . . . . . . . . . . . . . . . . . 24

   3.   Claims of the Class Representatives are Typical . . . . . . . . . . . . . . . . . . . . . 25

   4.   The Proposed Class Representatives Will Fairly and
        Adequately Protect The Interests of the Class . . . . . . . . . . . . . . . . . . . . . . . 26

B.   RULE 23(B)(3) IS SATISFIED BECAUSE COMMON QUESTIONS PREDOMINATE OVER ANY INDIVIDUAL QUESTIONS, AND A CLASS ACTION IS SUPERIOR TO ANY OTHER METHOD OF ADJUDICATION  . . 27

   1.   Common Issues Predominate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   2.   Class Litigation is Superior and Manageable  . . . . . . . . . . . . . . . . . 29

IV.   CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

<u>Cases:</u>                                                              Pages:

*Alba v. Papa John's USA, Inc.*,
    2007 WL 953849 at * 11-12 (C.D.Cal.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 25

*Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit*,
    2009 WL 249888  (S.D.Cal., Feb.  2, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*American Philatelic Soc. v. Claibourne*,
    3 Cal. 2d 689 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Arias v. Superior Court*,
    46 Cal.4th 969 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Arnold v. United States Theatre Circuit, Inc.*,
    158 F.R.D. 439 (N.D.Cal.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Bell v. Farmers Ins. Exchange*,
    87 Cal.App.4th 805 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Bell v. Farmers Ins. Exchange*,
    115 Cal.App.4th 715 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25, 26, 28

*Campbell v. PricewaterhouseCoopers, LLP*,
    253 F.R.D. 586 (E.D.Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 30

*California Rural Legal Assistance v. Legal Services Corp.*,
    917 F.2d 1171, 1175 (9th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
    20 Cal.4th 163, 180 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Chun-Hoon v. McKee Foods Corp.*,
    2006 WL 3093764 (N.D. Cal. Oct. 31, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Committee on Children's Television v. General Foods Corp.*,
    35 Cal.3d 197, 210 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Computer Economics, Inc. v. Gartner Group, Inc.*,
    50 F.Supp.2d 980 (S.D. Cal.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Consolidated Rail Corp., v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Dukes v. Wal-Mart, Inc.*,
    474 F.3d 1214 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Espinoza v. Domino's Pizza, LLC*,

2009 WL 882845 (C.D. Cal. Feb. 18, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Fireside Bank v. Superior Court,*
   40 Cal.4th 1069 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Gen. Tel. Co. of the Sw. v. Falcon,*
   457 U.S. 147 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 20

*Gentry v. Superior Court,*
   42 Cal. 4th 443 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-27

*Henry v. Quicken Loans, Inc.,*
   --- F.Supp.2d ----, at * 13 2008 WL 7294172 (E.D. Mich. Dec. 24, 2008) . . . . . . . . . . . 2

*Harris v. Palm Springs Alpine Estates, Inc.,*
   329 F.2d 909 (9th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Heffelfinger v. Elec. Data Sys. Corp.,*
   2008 U.S. Dist. LEXIS 5296 (C.D. Cal. Jan. 7, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Hirschfeld v. Stone,*
   193 F.R.D. 175 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Farmers Ins. Exchange, Claims Representatives' Overtime Pay Litig.,*
   481 F.3d 1119 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Sugar Industry Antitrust Litig.,*
   73 F.R.D. 322 (E.D. Pa. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Sugar Industry Antitrust Litig.,*
   1976 WL 1374 (N.D. Cal. May 21, 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Wells Fargo Home Mortgage Overtime Litig.,*
   571 F.3d 953 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 22, 23

*Johnston v. Pierce Packing Co.,*
   550 F.2d 474 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Kamar v. Radio Shack Corp.,*
   254 F.R.D. 387 (C.D.Cal. Oct. 08, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26, 27, 29

*Klay v. Humana, Inc.,*
   382 F.3d 1241 (11th Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Kurihara v. Best Buy,*
   2007 WL 2501698 (N.D. Cal. Aug. 30 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22

*Lerwill v. Inflight Motion Pictures, Inc.,*
   582 F.2d 507 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

*Massachusetts Mutual Life Ins. Co. v. Superior Court,*

97 Cal. App. 4th 1282 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

New Motor Vehicles Canadian Export Antitrust Litig,
   522 F.3d 6  (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Perez v. Safety-Kleen Systems, Inc.,
   253 F.R.D. 508 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 28

People v. Toomey,
   157 Cal. App. 3d 1(1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

People v. Bestline,
   61 Cal. App. 3d 879 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Ross v. U.S. Bank Nat. Assoc.,
   2009 WL 4282426 (N.D.Cal. Nov 25, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Sav-On Drug Stores, Inc. v. Superior Court,
   34 Cal. 4th 319 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21, 22

Schwartz v. Harp,
   108 F.R.D. 279 (C.D. Cal. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Schwarzschild v. Tse,
   69 F.3d 293 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Scott v. Aetna Servs., Inc.,
   210 F.R.D. 261, 268 (D.Conn.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Sosna v. Iowa,
   419 U.S. 393(1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Staton v. Boeing Co.,
   327 F.3d 938 (9th Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Tierno v. Rite-Aid,
   2006 WL 2535056  (N.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

Town of New Castle v. Yonkers Contracting Co.,
   131 F.R.D. 38 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Service Workers
International Union,
   --- F.3d ----, 2010 WL 22701, * 5 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 4, 20, 27

Vinole v. Countrywide Home Loans Inc.,
   571 F.3d 935 (9th Cir.2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Wal-Mart Stores, Inc. Wage and Hour Litig.,
   505 F.Supp.2d 617 (N.D. Cal. 2007)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Whiteway v. FedEx Kinko's Office & Print Servs.,
   2006 WL 2642528 (N .D. Cal. Sep. 14, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22, 25

*Yokoyama v. Midland Nat. Life Ins. Co.*,
    --- F.3d ----, 2009 WL 2634770  (9th Cir. Aug.  28, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 21


Statutes, Rules and Regulations:

California Business & Professions Code §17200. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

California Business & Professions Code §17203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

California Labor Code §203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

California Labor Code §226. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 28

California Labor Code §510. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

F.R.C.P. rule 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

8 Cal. Code Regs. §11040. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9, 23

28 U.S.C. §1332. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5


Secondary Authorities:

Newberg & Comte, *Newberg on Class Actions* (3d ed. 1992)  . . . . . . . . . . . . . . . . . . . . . . 24, 27

7A C.A. Wright, A. Miller & M. K. Kane, *Federal Practice and Procedure* . . . . . . . . . . . . . . . . 25

## I.      INTRODUCTION

Plaintiffs Scarlet Keshishzadeh, Lisa Archer and James Carey ("Plaintiffs") move for certification of their California Labor Code ("CLC") and the  California Business & Professions Code §17200 *et seq.* ("UCL") claims. The Class is objectively defined as "all individuals who, while in California, work or previously worked for Defendants as Claims Representatives and/or Senior Claims Representatives who processed Worker's Compensation Claims in the State of California during the period four years prior to the filing of this Complaint and ending on the date as determined by the Court." ("WC Claims Reps").

This Court has diversity jurisdiction over the Plaintiffs' state law claims against Arthur J. Gallagher and Company, a Delaware corporation, and its subsidiaries Arthur J. Gallagher Service Co. ("AJG") and Gallagher Bassett Services, Inc. a Delaware corporation ("GB") (collectively referred to herein as "Defendants") pursuant to the Class Actions Fairness Act ("CAFA").  See: First Amended Consolidated Complaint ("FACC"), at ¶ 45.  No federal claims are alleged in the FACC.

The Defendants are the joint employers of the Plaintiffs and the Class.  Arthur J. Gallagher and Company, the parent company, is an employer by reason of being the issuer of the paycheck. See Wage Statement, Exhibit 2.  AJG admits in the Answer to being the employer of the Plaintiffs and members of the putative class.  Answer at ¶¶ 1, 6, 7, and 8 [Doc. No. 56].  GB is also a joint employer by reason of the employment contract. See Employment Contracts, Exhibit 3.  The Defendants are all also jointly and severally liable under Business and Profession Code § 17203 as participants in creating the scheme and plan to implement the unlawful, unfair and deceptive conduct at issue in this case.  *People v. Toomey*, 157 Cal. App. 3d 1, 15 (1984); *People v. Bestline*, 61 Cal. App. 3d 879, 918-19 (1976); and *American Philatelic Soc. v. Claibourne*, 3 Cal. 2d 689, 697 (1935).

The causes of action the Plaintiffs seek certification of in the FACC are the first cause of action for unfair competition under the UCL, the second cause of action for unpaid overtime under Labor Code §510 and the third cause of action for failure to provide accurate wage statements under Labor Code §226.  These claims are all readily certifiable under applicable law.  See eg., *Perez v. Safety-Kleen Systems, Inc.*, 253 F.R.D. 508, 520 (N.D. Cal. 2008);  *Heffelfinger v. Elec. Data Sys. Corp.*, 2008 U.S. Dist. LEXIS 5296 (C.D. Cal. Jan. 7, 2008); *Alba v. Papa John's USA, Inc.*, 2007 WL 953849 at * 11-12

1  (C.D.Cal.2007); *Kurihara v. Best Buy,* 2007 WL 2501698 at * 10 (N.D. Cal. Aug. 30 2007); *Whiteway*

2  *v. FedEx Kinko's Office & Print Servs.,* 2006 WL 2642528 at *4  (N .D. Cal. Sep. 14, 2006); *Tierno*

3  *v. Rite-Aid,* 2006 WL 2535056, *9-10  (N.D. Cal. 2006).

4  　　　　Plaintiffs have also been appointed by the California Labor & Workforce Development Agency

5  as the State of California's Private Attorney General to pursue penalties on behalf of the State (75%)

6  and the members of the putative class (25%) as a representative claim.  California law does not require

7  the PAGA claim to be certified to proceed as a group action.  See: FACC at ¶¶ 78-80; and *Arias v.*

8  *Superior Court*, 46 Cal.4th 969, 980 (2009).  The common evidence to be offered to prove the PAGA

9  claim will be the same common evidence that will be offered to prove the state law class claims.

10  　　　　The predominant common liability question is whether the Defendants erred in claiming that

11  their interpretation of the California Administrative Exemption allowed Defendants to uniformly

12  classify the WC Claims Reps employed by Defendants as exempt during the class period.  The

13  Defendants made this decision on the advice of counsel and have asserted the attorney client privilege

14  so as to preclude any discovery as to the data they used in making this decision.  See Neigel Depo. at

15  49:15-51:21, Exhibit 6.  Defendants, by asserting the attorney client privilege to prevent disclosure of

16  the data used to assert the exempt classification and good faith affirmative defenses, subject themselves

17  to a motion to strike these affirmative defenses.[1]  *Henry v. Quicken Loans, Inc.*,  --- F.Supp.2d ----, at

18  * 13 2008 WL 7294172 (E.D. Mich. Dec. 24, 2008) (employer cannot rely on good faith defense based

19  in part on advice of counsel defense in classifying employees as exempt while asserting the attorney

20  client privilege to avoid disclosure of relevant information).

21  　　　　The advice of counsel defense does not immunize the Defendants from legal scrutiny.  To the

22  contrary, all the existence of the undisclosed 2004 and 2007 data proves is that the propriety of the

23

24  　　　[1] Defendants' Fourth Affirmative Defense alleges "The Complaint, and each purported cause of action therein is barred because defendant acted at all times in good faith."  Defendants' Fifteenth Affirmative Defense alleges that "plaintiffs were, at all time material to the Complaint properly

25  classified as exempt from overtime and related wage-and-hour laws, including but not limited to Industrial Welfare Commission Wage Order 4-2001, paragraph 1(A)(2) (administrative exemption) and

26  29 C.F.R. sections 541.200-541.204 (administrative exemption).  Plaintiffs intend to bring a motion to strike these affirmative defenses based on Defendants admitted failure to produce the data supporting

27  these affirmative defenses.  The "one-way intervention" rule limits the effect of this motion prior to certification.  See Rule 23(c)(2); *Schwarzschild v. Tse,* 69 F.3d 293 (9th Cir. 1995); *Fireside Bank v.*

28  *Superior Court,* 40 Cal.4th 1069, 1074 (2007).

1  claim of the administrative exemption as to all WC Claims Reps as a group is also a predominant

2  common question that is manageable and can be made on a group wide basis.

3       Indeed given the fact that Defendants have already made their exemption decision on a group

4  wide basis proves that individual issues as to the work preformed by any one WC Claims Rep will not

5  overwhelm the common proof as to the propriety of this group wide exemption decision.  The evidence

6  and expert analysis presented herewith  proves that this case is ideal for class certification as this Court

7  can decide this predominant common question of law here once and for all time rather than multiple

8  times on an ad hoc individual basis.

9       The predominant common questions of fact to be decided are (1) whether all the members of

10  the Class that worked for the Defendants as WC Claims Reps in California during the Class Period were

11  uniformly classified by the Defendants as exempt, (2) whether the WC Claims Reps during the Class

12  Period were required by the Defendants to preform the same tasks, (3) whether the tasks primarily

13  preformed by the WC Claims Reps during the Class Period as required by the Defendants were data

14  input, data entry and data communication using a standardized format to perform their tasks[2]; (4)

15  whether the WC Claims Reps during the Class Period were working on the production side of the

16  Defendants business of processing the Defendants' clients workers compensation claims, (5) whether

17  the acts of the WC Claims Reps during the Class Period on each file was so insignificant and

18  inconsequential such that no one act of a WC Claims Rep in preforming their tasks could conceivably

19  involve a matter of significance to the Defendants, and, (6) whether Defendants uniformly required the

20  WC Claims Reps to follow the law, the Client Servicing Instructions and the Best Practices Guide

21  under a standardized format pursuant to which the WC Claims Reps could not exercise any independent

22  judgment or discretion as to any matter of significance.

23       **As shown below numerosity, commonality, typicality, adequacy, predominance,**

24  **superiority and manageability  are all satisfied in this case and the case should be certified**

25  **because the Class Members all spent their time performing the same tasks and the predominant**

26

27       [2]  The amount time the Class members spend performing non-exempt tasks is determinative of their
exempt status under the CLC because the term "**primarily**" as used in the administrative exemption

28  means "**more than one-half the employee's work time.**" 8 Cal.Code Regs. § 11040(2)(N).

1   **issue of whether those tasks are exempt can and should be litigated on a class-wide basis.**  *United*

2   *Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Service Workers International Union*,

3   --- F.3d ----, 2010 WL 22701 (9th Cir. 2010);  *Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th

4   319 (2004).  Indeed, in *In re Wells Fargo Home Mortgage Overtime Litig.*,  571 F.3d 953, 959 (9th Cir.

5   2009) the Ninth Circuit recently recognized that overtime cases should be certified where "**class**

6   **members are actually performing similar duties," or the "employer exercised some level of**

7   **centralized control in the form of standardized hierarchy, standardized corporate policies and**

8   **procedures governing employees, uniform training programs, and other factors susceptible to**

9   **common proof.**"  *Id.* at 959.[3]  As demonstrated below, all of these factors supporting certification are

10   present here.  Moreover, certification of the state law claims in this case, as consistently held by the

11   California Supreme Court, serves important substantive state interests.  *Sav-On Drug Stores, Inc. v.*

12   *Superior Court*, 34 Cal. 4th 319, 340 (2004); *Gentry v. Superior Court*, 42 Cal. 4th 443, 456-7 (2007)

13          As set forth in detail herein and in the declarations filed herewith, this case is ideally suited to

14   proceed as a class action.  Accordingly, Plaintiffs respectfully submit that their motion for class

15   certification should be granted without prejudice.[4]

16

17   **II.      STATEMENT OF FACTS**

18          **A.      COMMON QUESTIONS OF FACT PREDOMINATE**

19          Defendant Arthur J. Gallagher Service Co. ("AJG") is incorporated under the laws of

20   the State of Delaware. See 10K at 1 of 175, <u>Exhibit 1</u>.[5] AJG is a legal entity that employs the Workers'

21   Compensation Claim Representatives ("WC Claims Reps").  See Answer at ¶¶ 1 & 2 [Doc. No. 56].

22   Arthur J. Gallagher & Co. is the employer of the WC Claims Reps by virtue of issuing wage statements

23   _____

24          [3]  Emphasis added and internal citations omitted unless otherwise indicated.

25          [4]  As the Ninth Circuit recently stated in reversing denial of class certification of a wage class action:
      "Moreover, a district court retains the flexibility to address problems with a certified class as they arise,
26   including the ability to decertify. "Even after a certification order is entered, the judge remains free to
      modify it in the light of subsequent developments in the litigation." *United Steel*, *supra*, 2010 WL
27   22701 at * 6 quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

28          [5]   All exhibits are attached to the Declaration of Aparajit Bhowmik ("Bhowmik Decl.") filed
      herewith, and "Exhibit" references refer to the Bhowmik Decl., unless otherwise noted.

1   with their name as the employer.  See Wage Statement, Exhibit 2.  GB is the employer of WC Claims

2   Reps according to the contract of employment.  See Employment Contracts, Exhibit 3.  As a result, all

3   Defendants are the joint employers of the Plaintiffs and other WC Claims Reps and are the direct

4   participants in the employment practices at issue here.

5       AJG and GB are both incorporated under the laws of the state of Delaware and are subsidiaries

6   of the parent company, Defendant Arthur J. Gallagher & Co.  See Answer at ¶ 1, [Doc. No. 56]; see

7   also 10K at p. 168, Exhibit 1.  Defendants employed more than 100 claims examiners in California in

8   the four (4) years preceding the filing of the Complaint (the "Class Period").  See Answer at ¶ 45, [Doc.

9   No. 56].  These WC Claims Reps provide third-party administration services to clients of Defendant

10  Arthur J. Gallagher & Co. and Gallagher Bassett Services, Inc.  Id.

11      The citizenship of Plaintiffs Scarlet Keshishzadeh, Lisa Archer and James Carey are all diverse

12  from the citizenship of the Defendants.  See Id. at ¶¶ 1, 2 & 45.  The class action filed by the Plaintiffs

13  Consolidated Class Action Complaint, [Doc. No. 54] (the "CCAC"), seeks more than $5,000,000 in

14  relief.  See Answer at ¶ 45, [Doc. No. 56].  Accordingly there is jurisdiction under CAFA.  See 28

15  U.S.C. §1332(d)(2).

16      The three (3) major operating segments of Defendant Arthur J. Gallagher & Co. are referred to

17  as Brokerage, Risk Management and Financial Services.  See 10K at pg. 6, Exhibit 1.  **Defendants do**

18  **not offer or sell workers compensation insurance.**  The WC Claims Reps who are the subject of this

19  action are employed within the Risk Management operating segment of Arthur J. Gallagher & Co.,

20  which is a "third party claims adjusting operation."  See Id. at pg. 8.

21      The  Risk Management operating segment represents one of the "major sources of operating

22  revenues for Arthur J. Gallagher & Co."  The fees received from the Risk Management operations  in

23  the year ending in December 31, 2008 amounted to $464.9 million.  See Id. at pgs. 6 & 8.[6]  According

24  to the Form 10-K Filing of Defendant Arthur J. Gallagher & Co.:

25      Revenues are usually generated on a negotiated per-claim or per-service basis.
        **[Arthur J. Gallagher & Co.] adjusters and service personnel act <u>solely on</u>**
26      **<u>behalf and under the instruction of their clients and customers</u>**.

27      ───────────────
        [6]   Approximately  69%  of  the  Risk  Management Segment's revenues are from workers
28  compensation related claims.

*See* Id. at p. 8.

**Defendants produce and sell claims adjusting services.**  In order to produce these services, Defendants maintained a constant fleet of WC Claims Reps in California that numbered approximately 225 employees at any given time. Ponta Depo. at 11:6-12:7, Exhibit 4.  In total, Defendants employed at least 444 WC Claims Reps during the Class Period, including the Plaintiffs.  See Class List, Exhibit 5; Answer at ¶¶ 6-8.  **The WC Claims Reps were and are all uniformly classified as "exempt."** Neigel Depo. at 120:2-13,  Exhibit 6.

### 1.   The Common Evidence Proves That All WC Claims RepsWere Uniformly Classified as Exempt by Defendants Based on Job Title Alone

Defendants produced five (5) witnesses who each testified on behalf of the corporation regarding the Defendants' policies of classifying the WC Claims Rep positions as exempt.  Defendants have also taken  the depositions to date of all three (3) named Plaintiffs.  Defendants have also produced over 115,000 pages of documents and answered twenty-three (23) interrogatories. Declarations of five (5) Class Members and one (1) Claims Supervisor have been produced.  Bhowmik Decl., ¶ 6. Also filed herewith are the expert declarations of Professor Joseph Lavitt, adjunct lecturer of insurance law at Boalt Law School ("Lavitt Decl") and Miles Locker, former Chief Counsel for the Divison of Labor Standards Enforcement ("DLSE") of the Department of Industrial Relations of the State of California ("Locker Decl").  **This evidence uniformly supports Plaintiffs' claims of Defendants' systematic classification of all WC Claims Reps as exempt was made uniformly and on a group-wide basis based upon job title alone.**

The decision to classify all WC Claims Reps as exempt was initially made prior to 1994 and then later pursuant to"broad reviews" that took place in 2004 and again later in 2007.  Neigel Depo., 37:3-18, Exhibit 6.  Defendants' corporate designee confirmed that the decisions to classify the WC Claims Reps as exempt in both reviews was made based on the advice of counsel. Id. at 49:15-51:21. Although the advice of counsel was relied on in classifying all WC Claims Reps as exempt, Defendants asserted the attorney-client privilege to withhold the data that was utilized in making the systematic

1    classification of all WC Claims Reps as exempt.  Id. at 46:17-49:13.[7]

2        Defendants' corporate designee testified that the broad reviews resulted in a company policy

3    that uniformly designated all Claims Representatives as exempt, regardless of whether the employee

4    produced Property, Liability, or Workers' Compensation files.  Id. at 26:3-27:2.  As a result,

5    Defendants performed no separate analysis to determine whether WC Claims Reps should be classified

6    as exempt.

7        The failure to separately analyze the propriety of the exemption for the WC Claims Reps

8    occurred despite the fact that substantial constraints are placed upon the WC Claims Reps' job duties

9    in the form of the California Labor Code, the Clients' Service Instructions, and the Defendants' Best

10   Practices.  See, e.g., Neigel Depo., 111:17-112:6, Exhibit 6.

11       Tellingly, Defendant's Vice President of Human Resources, designated as the person most

12   knowledgeable regarding the reasons Defendants classified the WC Claims Reps as exempt, testified

13   that he was not aware of whether Defendants considered, as part of their analysis, the California Labor

14   Code, the Client Service Instructions or the Best Practices Manual in  uniformly classifying all WC

15   Claims Reps as exempt based on job title alone. Id. at 33:1-14, Exhibit 6.  Moreover, Defendants

16   confirmed that the actual amount of time spent performing exempt activities was never considered in

17   the decisions to classify the WC Claims Reps as exempt.  Id. at 141:19-142:3.

18       Instead of determining the exempt status of each employee based on the actual job duties

19   primarily performed as required by California law, Defendants made the determination based on the

20   "role" of a claims adjuster generally, without regard to whether the employee performed work in the

21   Property, Casualty or Workers' Compensation field.  Id. at 26:3-27:12, 93:19-94:8.

22       Importantly, at no time does the "role" of the WC Claims Reps involve formulating any

23   management or operating policies for Defendants. Id. at 149:5-15; Martinnson Depo. at 248:10-249:5,

24   Exhibit 7; Ramirez Depo. at 270:13-19, Exhibit 8; Ponta Depo. at 183:10-183:18, Exhibit 4.  Further,

25   the "role" of the WC Claims Reps never involves any authority to waive the established policies of the

26   Defendants.  Neigel Depo. at 149:16-150:2, Exhibit 6; Johnson Decl. at ¶ 10 ("My job duties also never

27

28        [7] Defendants have also refused to produce the underlying contracts between Defendants and the
     clients that set forth the consideration to be paid for the services rendered.

1  included offering advice or recommendations to AJG's management related to their policies or general

2  operations.")

3       At bottom, Defendants confirmed that the actual "role" of the WC Claims Rep was and still is

4  uniformly to "apply  well-established techniques, procedures, and standards described in the

5  Defendants' manuals to the workers' compensation claims of the Defendants' clients as established by

6  the Defendants."  Neigel Depo. at 152:21-153:8, <u>Exhibit 6</u>; Ponta Depo. at 188:1-188:13, <u>Exhibit 4</u>.

7
          **2.**    <u>**Common Evidence Will Prove That Defendants Required Each WC Claims**</u>
8                  <u>**Rep to Perform the Same Tasks**</u>

9       The day to day activities that are performed by the WC Claims Reps consist of the same tasks

10  of data intake, data entry and data communication that are performed on a routine and repetitive basis

11  by all members of the Class.  Keshishzadeh Depo. at 170:6-17, <u>Exhibit 10</u> (describing the job duty of

12  producing the Workers' Compensation file as "**a routine thing**."); Archer Depo. at 93:2-16, <u>Exhibit</u>

13  <u>11</u> (describing the job duty of producing the Workers' Compensation file as **"per standard guidelines,**

14  **routine, repetitive, everyday type of work**."); Carey Depo. at 226:11-17, <u>Exhibit 12</u> (describing

15  Defendants' workplace as "**a  production environment**.  **Everything is standard and routine**..");

16  Declaration of Felicia Casey at ¶ 3, <u>Exhibit 13</u> (**"My job duties were primarily clerical in nature in**

17  **that I was responsible for routinely and repetitively processing an extremely high volume of**

18  **Worker's Compensation cases**."); Declaration of Colleen Hartsock at ¶ 6, <u>Exhibit 14</u> (**"The**

19  **processing of these files was an extremely routine and repetitive process that was accomplished**

20  **according to AJG's pre-established protocols and procedures**."); Declaration of Leslie Johnson at

21  ¶ 7, <u>Exhibit 9</u>, (**"The job duties described herein are all job duties I have observed other AJG**

22  **Claims Representative and Senior Claims Representatives perform on a repetitive and routine**

23  **basis**."); Declaration of Colleen D Rose at ¶¶ 5 & 9, <u>Exhibit 15</u> (same); Declaration of Ofelia Ulloa at

24  ¶ 7, <u>Exhibit 16</u> (**"The labor is routine, repetitive, and performed without any judgment or**

25  **independent discretion**.").   Plaintiff Keshishzadeh further explains: "**Indemnity cases are mostly**

26  **repetitive.  The same thing.  We go through the procedures**."  Keshishzadeh Depo. at 124:7-8,

27  <u>Exhibit 10</u>; *see also* <u>Id</u>. at 123:22 - 124:1 ("**all claims are repetitive, the same thing.  It's not out of**

28  **the ordinary**.").

1    ...we do the same thing over and over.  It's like every case is almost the same thing.  Every
2    examiner does the same thing.

Id. at 97:8-1.

3
4    ### 3.   Common Evidence Will Prove That The Tasks Primarily Performed by All the WC Claims Reps as  Required by Defendants Were Data Intake, Data Entry and Data Communication Using the Defendants' Standardized Format
5

6    The Job Descriptions for the WC Claims Reps are attached hereto as Exhibit 17 & 18. These

7    Job Descriptions prove that the essential functions of the WC Claims Reps are the same.  *See* Ponta

8    Depo. at 128:10-129:12, Exhibit 4 (explaining that the "essential functions" as set forth in the job

9    descriptions for the WC Claims Reps are the same); *see also* Ramirez Depo. at 130:7-12, 140:18-142:8,

10   Exhibit 8 (Job descriptions contain the "essential functions" of and "generally describe" the WC Claims

11   Rep position.)

12   Within these job descriptions, the common functions performed by the WC Claims Reps are

13   primarily comprised of routine and clerical job duties, the vast majority of which is data intake, data

14   entry and data communication.[8]  *See* Carey Depo. at 176:12-177:6; 182:3-14, Exhibit 12 (**Plaintiff**

15   **estimates that he spent 75% of his working time for Defendants performing data entry**.); *see also*

16   Keshishzadeh Depo. at 138:1-15; 143:21-145:8; 148:19-23; 150:13-151:25, Exhibit 10 (**Plaintiff**

17   **estimates that she spent 70% of her working time for Defendants performing "rote" data entry**);

18   Archer Depo. at 27:21-29:8; 30:8-15, 35:6 - 36:8, Exhibit 11 (**Plaintiff estimates that she spent 80%**

19   **of her working time for Defendants performing data entry, much of which was simply copying**

20   **and pasting information into the file maintained on Defendants' computer system**.); Ulloa

21   Declaration at ¶ 3, Exhibit 16 (**"As a Claims Representative, my job duties were primarily to**

22   **examine and verify documents related to Worker's Compensation claims**."); Rose Decl. at ¶ 6,

23   Exhibit 15 (**describing responsibility of primarily performing "manual data entry" and**

24   _____

25   [8]   **The amount time the Class members spend performing non-exempt tasks is determinative**
     **of their exempt status under the CLC because the term "primarily" as used in the administrative**
     **exemption means "more than one-half the employee's work time."** 8 Cal.Code Regs. §
26   11040(2)(N). Here, the standardized format for work followed by every WC Claims Rep ensures that
     each spends their time on the same tasks.  Indeed, the evidence establishes that the WC Claims Reps
27   spent more than 70% of their time performing the tasks of data intake, data entry and data
     communication (Locker Decl at ¶23), and little to no time considering alternatives (Lavitt Decl at
28   pp.25-26).

1  **"inputting, updating and verifying information into the file**."); Johnson Decl. at ¶ 6, <u>Exhibit 9</u>

2  (**describing responsibility of primarily inputting data into file**); Hartsock Decl. at ¶ 3, <u>Exhibit 14</u>

3  ("**job duties were primarily to examine and verify documents related to Worker's Compensation**

4  **claims**").  See also Locker Decl at ¶¶ 21-25.

5       As described above, WC Claims Reps were primarily engaged in inputting the information

6  regarding the WC claims files into the Defendants' computerized files using preformatted templates.

7  *See* Martinnson Depo. at 181:21-182:3, <u>Exhibit 7</u> (Defendants require WC Claims Reps to document

8  all actions taken and all conversations regarding the claim file.); *see also* Ponta Depo. at 60:2-61:1,

9  <u>Exhibit 4</u> (describing the plan of action data entry which uses a pre-formatted template).   These

10  templates also include "**special diaries**," which alert the WC Claim Reps regarding time constraints

11  that must be adhered to regarding clerical tasks such as paying bills and sending out form letters

12  pursuant to standardized protocol.  The common requirement for Defendants is that if a WC Claims Rep

13  ignores or otherwise fails to respond to a special diary alert, or if a WC Claims Rep fails to respond to

14  any alert that may be generated in the claim, upon issuance of the second alert, that "item" would be

15  escalated to the supervisor and/or further up the Defendants' chain of command.  <u>Id</u>. at 55:10-57:3.

16             **4.**    <u>**Common Evidence Will Prove That All Claims Reps Work on the Production Side of Defendants' Business**</u>

17       The WC Claims Reps on a day to day basis are routinely responsible for the repetitive churning

18  of an inordinately high volume of files in an environment that is nothing less than an electronic white

19  collar sweatshop.[9]  Locker Decl at ¶ 22.  The Plaintiffs confirmed that their average active caseloads

20  ranged from between 110 to 160 active open files at any time.  See Keshishzadeh Depo. at 22:23 -

21  23:18, <u>Exhibit 10</u>; Archer Depo. at 23:16 - 24:25, <u>Exhibit 11</u>; and, Carey Depo. at 15:1-18, <u>Exhibit 12</u>.

22       By the admission of Defendant's own Claims Supervisors, this was a large volume of files that

23  the WC Claims Reps were required to handle on a day to day basis and close as many cases as are

24  opened.  *See*, *e.g.*, Archer Performance Eval., <u>Exhibit 19</u> at pg. D-03147 ("we knew there would be a

25  transition period where **she would need to adjust to the volume of new losses a very active caseload**

---

27      [9]    The WC Claims Reps work in fifteen (15) locations in California and most work in cubicles

28  under the constant scrutiny of supervisors and managers.  Martinnson Depo. at 37:4-6, <u>Exhibit 7</u>; Ramirez Depo. at 69:2-71:8, <u>Exhibit 8</u>;  Interrogatory Nos. 13-14, <u>Exhibit 26</u>.

**entails**. Lisa's signs of discouragement always seemed to revolve around the volume of work and having the time to do it."). The pressure to mechanically shuffle one file to the next was at all times maintained at a high level due to Defendants' practice of evaluating the performance of WC Claims Reps primarily on closing ratios. See Carey Performance Eval. Exhibit 20, pg. D-03376 (showing a common requirement for Defendants' WC Claims Reps to maintain a "**1 to 1 closing ratio**" as stated under "Business Objectives").

> ### 5. Common Evidence Will Prove That Each Individual File the WC Claims Reps Processed Was Insignificant to Defendants' Business

The evidence produced in this action confirms that the WC Claims Reps in the Defendants' California Workers' Compensation office branches are interchangeable parts in a well-oiled machine, routinely embroiled in the day to day operations of processing a large number of Workers' Compensation claim files. The numbers evidence that each of the individual claims that each WC Claims Rep processes are relatively small in comparison to the business as a whole such that the production line labor of these workers, on an individual basis, can hardly amount to any matter of significance.

For the entire Class Period, the average amount paid for each claim handled by the members of the Class from inception to close was $24,198.25 for the 259,486 files closed during the Class Period by the Class Members. See Claims Summary, Exhibit 21. This relatively small average amount paid per file stands in stark contrast to the total amount paid for all files which amounted to $2,258,108,496.43. Given these totals, the act of any one WC Claims Rep on the average file amounts only to **one one-thousandth of one percent (.001%)** for all WC claims produced by the Class Members during the Class Period. See Claims Summary, Exhibit 21.

One of the reasons that the WC Claims Reps' individual significance to the Defendants is so minuscule is that their authority to settle claims was set to relatively low levels. As shown on the analysis of the Client Servicing Instructions of the Defendants, which sets forth the Settlement Authority for the Claims Representatives, the average settlement authority provided to the WC Claims Reps was only $20,296.61. *See* Spreadsheet of Servicing Instructions, Exhibit 22.

This limited settlement authority reflects the relatively small size of the claims adjusted by the

1    WC Claims Reps as compared to the $2 billion in funds that was paid out on the 259,496 files that were

2    closed during the Class Period.[10]

3            The analysis of the Service Instructions further details that the reserve authority of the WC

4    Claims Reps was set at relatively low levels.  The average reserve authority provided to the WC Claims

5    Reps was only $25,517.75.  *See* Spreadsheet of Servicing Instructions, Exhibit 22.

6            **Importantly, the settlement and reserve authority provided to the WC Claims Reps was**

7    **insubstantial not only in relative monetary amounts, but also in the relative amounts of time the**

8    **WC Claims Reps spent performing setting reserves and settlements.**  As detailed *infra*, the common

9    evidence adduced in this action demonstrates that the vast majority of the WC Claims Reps time was

10   spent performing the tasks of data intake, data entry and data communication.  See Carey Depo.,

11   138:12-139:5, Exhibit 12 (only **10-15%**) of the files Plaintiff Carey produced were litigated);

12   Keshishzadeh Depo., 52:2-54:12, 115:24-116:1, Exhibit 10 (litigated files represented only **15-20%**

13   of Plaintiff's workload); Archer Depo. at 120:2-10, Exhibit 11 (Plaintiff Archer estimates that of the

14   approximately 275 active case files she produced for Defendant's clients, she only settled between 20

15   and 50 files.).  Acting primarily as mere conduits of information, the WC Claims Reps were simply

16   spending insignificant amounts of time setting reserves on or settling their individual WC claims.

17            **6.      Common Evidence Will Prove That Defendants Uniformly Required the**
             **WC Claims Reps to Follow the Law, Client Servicing Instructions and Best**
18           **Practices Guide under a Standardized Format Pursuant to Which They**
             **Could Not Exercise Independent Judgment or Discretion as to Any Matters**
19           **of Significance**

20           The procedures used in performing these job duties were not only similar, but were in fact

21   identical given the standardized processes and forms the WC Claims Reps were required to use

22   pursuant to applicable law, the Clients' Servicing Instruction and the Defendants' "Best Practices." See

23   Ponta Depo. at 142:21-143:5, Exhibit 4 (Defendants' WC Claims Reps processing WC claims in

24   California must comply with the law, clients' servicing instructions, and Defendants' Best Practices and

25   supervision in the performance of their tasks).

26   _____

27      [10]    All WC Claims Representatives need the supervisor's approval before they may settle any claim
        in excess of the WC Claims Representative's authority level, and the WC Claims Reps settle 80% to
28      85% of all claims as part of the standardized routine without any dispute pursuant to the strict confines
        of the law, Client Servicing Instructions and the Best Practices Guidelines.

Borrowing from Alexis de Tocqueville's description of over-regulation, Gallagher claims representatives operate within a " … a network of small complicated rules, minute and uniform, through which the most original minds and the most energetic characters cannot penetrate, to rise above the crowd.

See Lavitt Decl, Exhibit "A" at p.27.

### a.   Compliance with California Law

The WC Claims Reps are expressly forbidden from making the decision that a particular claim is not covered because the decision to pay Workers' Compensation benefits is strictly dictated by the California Labor Code.  Lavitt Decl at pp.4-13.  As a result, to deny coverage the WC Claims Reps are obligated to bring any issues regarding a delay or denial of coverage to their superiors. Also, in cases where subrogation and/or fraud issues arise, WC Claims Reps are required to defer the issues to special units within AJG.  See SI Spreadsheet, Exhibit 22 at Fns 1 & 2; see also Carey Depo., 113:1-114:3, Exhibit 12; Archer Depo., 49:3-53:10, Exhibit 11 (whether additional investigation needed determined by a "set standard" of referring certain files to the "Special Investigation Unit" for cases involving a pre-established "red flag.").  These set standards uniformly applied across the board to "[a]ll the claims adjusters."  Archer Depo. at 53:10-21, Exhibit 11.

The California Labor Code imposes constraints that obviate any independence that could be exercised by the WC Claims Reps as to matters of significance.  For example, several inhibiting time constraints are imposed by the Cal. Lab. Code that at all times must be adhered to by the WC Claims Reps.  See, e.g., Ponta Depo. at 72:20-74:2, Exhibit 4 (describing (i) Labor Code Section 5401, which mandates that a claim form must be provided to the employee within 24 hours of knowledge of an injury and (ii) Labor Code Section 4650, which mandates a 14-day requirement to provide the first disability check to the claimant.).  The WC Claims Reps must all strictly adhere to the Labor Code because the failure to meet the time sensitive deadlines is grounds for impositions of substantial penalties.  Ponta Depo., at 78:24-79:20, Exhibit 4.

California Law also ensures that WC Claims Reps perform identical tasks by mandating as of 2005 that all WC Claims Reps obtain training to be certified to adjust Workers' Compensation claims. See Carey Depo., 26:2 - 27:4, Exhibit 12 (Plaintiff Carey received training and a certification to works as a WC Claims Rep, including an IEA certificate and continuing education needed to maintain the IEA

certification);  Keshishzadeh Depo. 18:19 -20:17, <u>Exhibit 10</u> (Plaintiff Keshishzadeh received training and a certification to works as a WC Claims Rep, including an IEA certificate and continuing education needed to maintain the IEA certification.); Archer Depo., 17:4-19:16, <u>Exhibit 11</u> (Plaintiff Archer has received training and certifications to works as a WC Claims Rep, including an IEA certificate, a Workers' Compensation Claims Professional Certificate, and a California Experienced Certification); *see also* Martinnson Depo., 17:13-17:25, <u>Exhibit 7</u>; Ponta Depo., 89:2-89:21, <u>Exhibit 4</u>; and Ramirez Depo. at 138:15-139:13, <u>Exhibit 8</u> (a WC Claims Rep "is required to have at least 160 hours of training with 120 hours being conducted in a classroom with an instructor.").  Given that the training regulations were promulgated in 2005, all requirements have been uniform throughout the Class Period.

### b.   Compliance with the Clients' Servicing Instructions

Defendants emphasize the importance of adhering to the protocol mandated by the Clients' "Servicing Instructions."  For example, Plaintiffs' Performance Reviews state that the second most important "Business Objective" after client satisfaction is for all WC Claims Reps to "**[a]dhere to Special Claim Handling guidelines/Performance Guarantees specific to client**."  *See* Plaintiffs' Performance Reviews: Carey Eval., <u>Exhibit 20</u> at D-03380; Performance Evaluation of Scarlet Keshishzadeh, a true and correct copy of which is attached hereto as  <u>Exhibit 23</u> at D-00926; and, Archer Eval. <u>Exhibit 19</u> at D-03142; *see also*  Carey Depo., 39:16-18, <u>Exhibit 12</u>; Keshishzadeh Depo., 141:14-20, <u>Exhibit 10</u>; Archer Depo., 172:16-18, <u>Exhibit 11</u>.

The understanding that the WC Claims Reps are left no option but to adhere to the standardized protocol as set forth in the Service Instructions is confirmed by Defendants' corporate designees. *See* Martinnson Depo. at 196:20-197:24, <u>Exhibit 7</u> (explaining that WC Claims Reps "**need to be very familiar**" with the provisions, limitations, and various authority levels detailed in client's Handling Instructions); Ponta Depo. at 50:17-51:11, 142:21-143:5, 203:2-203:10, <u>Exhibit 4</u>; Ramirez Depo. at 267:5-7, <u>Exhibit 8</u>.

For Plaintiffs and all WC Claims Reps, the *procedure* for setting the reserves was set forth in the Best Practices, while the authority for the *amounts* that could be set was set forth in the Client's Servicing Instructions.  *See* Carey Depo. at 130:2-24, <u>Exhibit 12</u> (approval needed from a Claims Supervisor for amounts set over $50,000); Keshishzadeh Depo. at 88:10-89:23, <u>Exhibit 10</u>

1    (approval needed for amounts set over $25,000); Archer Depo. at 111:6-112:16, Exhibit 11.

2         Plaintiffs have analyzed a statistically significant sample of the Client Servicing Instructions

3    as shown on the Spreadsheet attached hereto as Exhibit 22.  The commonality of the constraints

4    imposed on the Class Members by the Servicing Instructions is remarkable in that no independence is

5    afforded by the clients. **Across the board, the clients require that the WC Claims Rep must obtain**

6    **client approval before proceeding with any of the following processes:**

7         Claim denial, legal referral, subrogation, surveillance, utilization review,
     vocational rehabilitation, field case management, telephonic case management,
8         setting a reserve in excess of the specific reserve authority level stated in the SIs
     and, entering into a settlement in excess of the specific settlement authority level
9         stated in the SIs.

10   See SHI Spreadsheet, fn 1, Exhibit 22.

11        **The Servicing Instruction further impose additional constraints by requiring**

12   **authorization from the Class Members' chain of supervision before the following processes can**

13   **occur:**

14        Claim denial, legal referral, subrogation, surveillance, utilization review,
     vocational rehabitation, field case management, telephonic case management,
15        setting a reserve in excess of the specific reserve authority level stated in the SIs
     and, entering into a settlement in excess of the specific settlement authority level
16        stated in the SIs.

17   See Id. at fn 2.

18        Aside from the data intake, data entry, data communication that was primarily performed by the

19   Plaintiffs and the WC Claims Reps (70% to 80% of their work time), the WC Claims Reps were also

20   responsible for setting reserves for the Workers' Compensation files up to a maximum as set forth in

21   the Servicing Instructions, which actually took very little time.  Further, according to the Defendants'

22   Best Practices, the standardized protocol for setting these reserves was to utilize the MIRA computer

23   program, which is a computer program that estimates the reserves from the data inputted into the file

24   by Plaintiffs and all the other WC Claims Reps.  Keshishzadeh Depo., 82:8-25, Exhibit 10; Archer

25   Depo., 28:24 - 30:15, 107:9-21, Exhibit 11; Martinnson Depo. at 215:15-216:5, Exhibit 7; Ramirez

26   Depo. at 241:12-242:21, Exhibit 8; Ponta Depo. at 84:1-84:25, Exhibit 4.

27              **c.       Compliance with Defendants' Best Practices Guide**

28        At all times, the Defendants' requirement was that the WC Claims Reps strictly adhere to

1   Defendants' standardized format for resolving claims.  The standardized format that dictated how and

2   in what way Plaintiffs and the other WC Claims Reps were to perform their work was referred to as

3   Defendants' "Best Practices," attached as <u>Exhibit 24</u>.  *See* Carey Depo. at 171:14-22, 172:19-173:1,

4   173:2-7, 181:8-16, <u>Exhibit 12</u> (Plaintiff understood that he was required "**to work within the**

5   **parameters of the Best Practices**.");  Keshishzadeh Depo. at 118:23-24, 84:24-85:1, <u>Exhibit 10</u>

6   (Plaintiff understood that she was required "**to adhere to Gallagher Bassett's Best Practices**.").

7           As described by Plaintiff Archer, the Best Practices:

8           **is referred to on a daily basis by Gallagher Bassett in all areas of management, that**
            **everything has to be followed per Best Practices. Per Best Practices, any time there**
9           **is an update in Best Practices, you have to follow that.**

10          **They do training on Best Practices for four days to a new employee.  They do**
            **training on Best Practices constantly.  So basically Best Practices is giving you a**
11          **guidelines of how Gallagher Bassett wants things done**.

12  Archer Depo., 171:14-172:4; 176:7-23.

13          The WC Claims Reps are left no option but to adhere to the standardized format as set

14  forth in the Best Practices as confirmed by Defendants' corporate designees.  *See* Ponta Depo. at

15  50:17-51:11, 140:17-141:2, <u>Exhibit 4</u> ("**it's outlined in our best practices what the guidelines are**

16  **for accomplishing these various and multiple protocols**.");  Martinnson Depo. at 48:4-48:11,

17  55:4-55:13, 242:14-243:1, <u>Exhibit 7</u> (The WC Claims Reps "**are all employing...the Best Practices**

18  **as part of their handling of [the] claim files.**").  Indeed, in the Plaintiffs' Performance Reviews, the

19  second most important section after "Client Satisfaction" is the section of "Business Objectives"

20  entitled, "Manuals and Standards," which lists the following three Business Objectives:

21          1) Review and adhere to Product Standards Manual.
            2) Review company Human Resources Policy Manual.
22          3) **Review and adhere to Best Practices Manual**.

23  *See* Carey Review at D-03380, <u>Exhibit 12</u>; Kesh. Review at D-00926, <u>Exhibit 10</u>; and, Archer Review

24  at D-03142, <u>Exhibit 11</u>.  The job duty primarily performed by the WC Claims Reps of data intake, data

25  entry and data communication was performed pursuant to the Defendants' 3-Point Contact protocol,

26  which is set forth within the Defendants' Best Practices.  *See* Best Practices at D- 01182, <u>Exhibit 24</u>.

27          The checklist attached as <u>Exhibit 25</u> must be used to perform the 3 Point Contact protocol such

28  that the WC Claims Rep contacts the insured, the claimant and the medical care provider within the first

twenty-four (24) hours of assignment of the claim.  As a result of the uniformly of this procedure, the information gathering and data entry process that is undertaken pursuant to this grid is "**tightly scripted**."  Archer Depo. at 44:17-19, Exhibit 11; *see also* Carey Depo. at 28:14-29:4, 59:24-60:8, Exhibit 12 (**"[W]e would follow pretty much the standard procedure.  We followed the script, we asked the questions, and asked for additional information as the questions had prompted us**.");  Keshishzadeh Depo. 60:19 - 61:1; 144:13-145:2; 151:9-20, Exhibit 10 (Plaintiff was required to spend the majority of her working time inputting and copy and pasting into the file information received from "three-point contacts," information received from attorneys, doctors, documentation that was received through the mail, as well as all information received from telephone calls.)

Professor Lavitt provides this Court with his detailed expert opinion that the common facts prove that the primary job duties of WC Claims Reps both qualitatively and quantitatively do no involve the exercise of independent judgment and discretion concerning matters of significance.  See Lavitt Decl at pp.17-27.  The opinion is compelling, both as to the detailed discussion of the workers compensation claims administration process in general and how and in what ways Defendants implement this process.  Lavitt Decl at pp.1-27.

**B.    COMMON EVIDENCE WILL ESTABLISH DEFENDANTS' CHAIN OF COMMAND AND CONTROL**

In processing these Workers' Compensation files, the WC Claims Reps were not permitted to exercise discretion as to matters of significance..

**1.    Claims Supervisors**

At all times, Defendants employed Claims Supervisors who regularly monitored, supervised and approved the work product of the WC Claims Reps. *See* Keshishzadeh Depo. at 172:14-17, Exhibit 10 (describing how **she and all other WC Claims Reps "need a lot of authorization from the supervisor**."); Archer Depo. at 15:3-15:15, Exhibit 11 (describing how **she and all other WC Claims Reps worked under Defendant's supervisors who had "over-diaries," which they used to constantly monitor her work on "every single file."**);  Carey Depo. at 172:9-14, Exhibit 12 (**he and all other WC Claims Reps "all spoke regularly with our supervisors about our cases."**).

The issuance of any delay or denial on any claim was not a job duty that was

---

1  independently performed by Plaintiffs and the WC Claims Reps because the decision always needed

2  to be approved by the Claims Supervisors.  Carey Depo., 98:4-7, 100:22-24, Exhibit 12; Keshishzadeh

3  Depo., 43:14 - 44:16; 172:14 - 25, Exhibit 10; Archer Depo., 13:6-13, Exhibit 11.

4       This close level of supervision was made possible by the large numbers of Claims

5  Supervisor Defendants employed to supervise the WC Claims Reps.   During the Class Period,

6  **Defendants employed 296 Claims Supervisors who on average supervised between 3 to 10 Claims**

7  **Representatives, Senior Claims Representatives and/or Claims Assistants.**  *See* Def. Resp. to

8  Interrogatory Nos. 13-14, Exhibit 26; *see also* Carey Depo. at 16:1-10, Exhibit 12 (**Plaintiff worked**

9  **under his Claims Supervisor, who directly supervised him and four (4) other WC Claims Reps**

10  **who all had the same workload**); Kesh. Depo., 23:19-24:6, Exhibit 10 (**Plaintiff worked under her**

11  **Claims Supervisor who directly supervised her and seven (7) other WC Claims Reps who all had**

12  **the same workload**); Archer Depo. at 27:12-28:3, Exhibit 11 (**Plaintiff worked under her Claims**

13  **Supervisor who directly supervised her and five (5) other WC Claims Reps**.).

14       On a monthly basis, Defendants' supervisory personnel, including:

15       [t]he claims supervisors randomly review an average of three files to determine
        whether the claims representative or senior claims representative responsible for
16       the file is following the framework outlined in Defendant's Best Practices and
        utilizing it on a case by case basis dependent on the particular facts and
17       circumstances of the claim.

18  *See* Def. Resp. Interrogatory No. 19, Exhibit 26.

19       The Claims Supervisors further supervised the work product of the WC Claims Reps in that they

20  would:

21       **review every claim administered by their claims representatives within 30
        days of the initial setup of a file, and approximately every 90 days**
22       **thereafter, to assess general compliance with Best Practices**.

23  Id.

24       The Claims Supervisors were able to closely monitor the acts of the  WC Claims Reps  because

25  they were linked by computers where all the claim information was stored and processed and the

26  Supervisors worked on the same floor as the Claims Representatives, for the most part  in offices

27  adjacent to the WC Claims Reps' cubicles.  Martinnson Depo. at 37:4-6, Exhibit 7; Ramirez Depo. at

28  69:2-71:8, Exhibit 8;  Interrogatory Nos. 13-14, Exhibit 26.

---

### 2.    Branch Managers

The lack of independence of the WC Claims Reps in performing their day-to-day job duties is further illustrated by additional links Defendants placed in their chain of supervision.  On top of the Claims Supervisors who monitored, supervised and approved the work product of the WC Claims Reps, Defendant further required that "Branch Managers also review approximately 40 files per month to assess general compliance with Best Practices or review a particular issue within a file." *See* Def. Resp. Interrogatory No. 19, Exhibit 26.

### 3.    Corporate Audits

The chain of supervision of the WC Claims Reps was also bolstered by periodic corporate audits of the WC branches by the corporation.  As explained by Defendants,

> Each branch is audited approximately every one to two years. During the corporate audit of a branch, approximately 200 files are reviewed to determine whether the claims representatives and senior claims representatives are generally handling files in accordance with Defendant's Best Practices.

Id.

**These stifling constraints on the WC Claims Reps uniformly imposed by the Defendants' chain of supervision were in effect at all times during the Class Period.** Id.  Importantly, as shown by Defendants' own admissions, these constraints applied uniformly to all WC Claims Reps.  Id.; see also Martinnson Depo. at 55:14-56:2, Exhibit 7 (WC Claims Reps are expected to follow directives from Claims Supervisors); Ponta Depo. at 47:15-47:21, 115:16-115:21, Exhibit 4 (Claims Supervisors enter contemporaneous notes under a "supervisory category note" in the WC Claims Reps' claim file taking place every 30 and 90 days); Ramirez Depo. at 26:5-27:4, 31:25-33:4, 191:11-192:16, Exhibit 8 (describing the uniformity of supervisory practices during the Class Period); Declaration of Kevin Roberts ("Roberts Decl.") at ¶¶ 4-5, a true and correct copy of which is lodged as Exhibit 27 (same).

## III.    ARGUMENT

### A.    CERTIFICATION STANDARD UNDER RULE 23

Rule 23 of the Federal Rules of Civil Procedure governs class actions in federal court. Rule 23(a) sets forth the four general criteria for certification of a class:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Once plaintiffs satisfy Rule 23(a)'s prerequisites, the court must also find that the action satisfies one of the three conditions of subdivision (b) of Rule 23.  Here, Plaintiffs rely on Rule 23(b)(3), which requires that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for a fair and efficient adjudication of the controversy.

For purposes of determining class certification, the court "is bound to take the substantive allegations of the complaint as true." *Blackie v. Barrack,* 524 F.2d 891, 900, n. 17 (9th Cir. 1975).  So long as the Court is presented with sufficient material to determine the nature of the allegations and to rule upon apparent compliance with the  requirements of Rule 23, certification of the class is appropriate. *Blackie,* 524 F.2d at 901.  A weighing of competing evidence is inappropriate at the certification stage of the litigation. *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir.2003); *Chun-Hoon v. McKee Foods Corp.,* 2006 WL 3093764, *4  (N.D. Cal. Oct. 31, 2006).

**"[N]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies [Rule 23]."**  *United Steel*, *supra*, 2010 WL 22701, * 5 (9th Cir. 2010) quoting *Blackie,* 524 F.2d at 901.  "Moreover, a district court retains the flexibility to address problems with a certified class as they arise, including the ability to decertify. 'Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.'" *Id.* at * 6 quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

**B.     SUBSTANTIVE STATE LAW APPLIES TO THE CERTIFICATION OF THE CLAIMS HERE**

This case includes only state law claims.  In deciding whether to certify state law claims, federal courts must focus on the substantive elements for each state law cause of action and the proof necessary.  *Johnston v. Pierce Packing Co.*, 550 F.2d 474, 476, n1 (9th Cir. 1977); *Computer*

1   *Economics, Inc. v. Gartner Group, Inc*., 50 F.Supp.2d 980, 990 (S.D. Cal.1999). See also *New Motor*

2   *Vehicles Canadian Export Antitrust Litig*, 522 F.3d 6, 22, & n.12  (1st Cir. 2008) (recognizing that the

3   presumption of common impact under the California antitrust statute is substantive and therefore

4   governed by state law).

5        Recently, the Ninth Circuit reversed denial of a certification of a Hawaii consumer protection

6   statute claim. *Yokoyama v. Midland Nat. Life Ins. Co.*, --- F.3d ----, 2009 WL 2634770  (9th Cir. Aug.

7   28, 2009).  In *Yokoyama*, the district court failed to follow the binding state court precedent establishing

8   a preference for consumer protection claims to proceed on a class action basis:  "Hawaii's state courts

9   have made clear that Hawaii's consumer protection laws are flexible and may be enforced through the

10  class action mechanism.  Accordingly, this class should have been certified."  *Id*. at *6.

11       *Yokoyama* held that federal courts applying Hawaii law were bound by the fact that "Hawaii's

12  consumer protection laws expressly consider class actions to be appropriate enforcement mechanisms

13  . . . [and] Hawaii's courts recognize that its consumer protection laws can be enforced through class

14  actions." *Id.* at *5.  Likewise, this Court, in exercising jurisdiction over state law claims under CAFA,

15  must follow the binding pronouncements from the California Supreme Court  favoring class action

16  treatment for overtime wage claims under the California Labor Code.

17       In *Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319 (2004), the California  Supreme

18  Court recognized that class certification of overtime claims was required because **"California's**

19  **overtime laws are remedial and are to be construed so as to promote employee protection."** *Id*.

20  at 340.  Federal Courts applying California law have recognized and applied this  substantive policy

21  in favor of class certification of overtime wage claims. See e.g., *Wal-Mart Stores, Inc. Wage and Hour*

22  *Litig*., 505 F.Supp.2d 609, 617 (N.D. Cal. 2007) (California's overtime laws are remedial and are to be

23  construed so as to promote employee protection). *Tierno*, *supra*,   2006 WL 2535056 at  *10.

24       **C.       STANDARD FOR  CERTIFICATION OF OVERTIME WAGE ACTIONS**

25       **In *Sav-On*, the California Supreme Court unanimously endorsed class treatment of**

26  **overtime claims under the California Labor Code where each of the class members' performed**

27  **similar tasks.**   34 Cal 4th . at 329.  Where, as here each Class Member performs the same tasks the

28

action "can easily be resolved on a class wide basis by assigning each task to one side of the ledger..." and classification of tasks as exempt ot non-exempt is therefore susceptible to common proof. *Id*. at 331, 333. In *Sav-on*, certification was appropriate because whereclass members performed a "definite, and finite list of such tasks, then that issue can easily be resolved on a class wide basis. " *Id.* at 333-335.

Certification, however, does not require that the class members' circumstances to be identical. "Neither a variation in the mix of actual work activities undertaken during the Class period by individual class members, nor differences in the total unpaid overtime owed to each class member, bars certification." *Sav-On*, 34 Cal.4th at 333-335. See also *Kamar v. Radio Shack Corp*., 254 F.R.D. 387, 399 (C.D. Cal. 2008)("The existence of certain individualized or deviating facts will not preclude certification if most class members were subjected to a company policy in a way that gives rise to consistent liability or lack thereof") *Kurihara*, 2007 WL 2501698, *9-10; *Whiteway*, 2006 WL 2642528 at *7 (granting class certification and finding that mangers shared similar job duties and responsibilities, even though there was some variation in job duties depending on the type and size of the managers' store).

In *In re Wells Fargo Home Mortgage Overtime Litig*., *supra*, 571 F.3d 953 and *Vinole v. Countrywide Home Loans Inc*., 571 F.3d 935, 947 (9th Cir.2009), the Ninth Circuit recognized that *Sav-On* governs the substantive certification standards for CLC claims. "The California Supreme Court has cautioned that a defendant cannot defeat class certification simply by raising an exemption as an affirmative defense" *Vinole*, 571 F.3d 935, 945 n.11, quoting *Sav-On* 34 Cal.4th at 206.  The Ninth Circuit also acknowledged that under *Sav-On*, the uniform classification of all employees with the same job title as exempt was a factor that supported predominance.

> **Of course, uniform corporate policies will often bear heavily on questions of predominance and superiority**.... **Such centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof.**

*Wells Fargo*, 571 F.3d at 958-59.

The Ninth Circuit, however, rejected the district court's ipso facto ruling that such a uniform classification policy estopped an employer from opposing class certification, even where class members did not perform similar tasks. The Ninth Circuit instead adopted the reasoning of *Campbell v.*

*PricewaterhouseCoopers, LLP*,  253 F.R.D. 586 (E.D.Cal. 2008), which rejected certification by estoppel but held that certification was appropriate where the class members spent their time performing similar job tasks.  *Wells Fargo*, at 959, quoting *Campbell*, 253 F.R.D. at 603.[11]

*Campbell* granted class certification finding that "Although there is also some evidence of variation in the duties performed by associates within the same division, the duties are nevertheless sufficiently similar to warrant class treatment." 253 F.R.D. at 603.  This is not a case like *Wells Fargo* or *Vinole* where Plaintiffs seek certification against an employer where the employees with a common job title perform different tasks.  The evidence here establishes that Defendants required each WC Claims Rep to actually spend their time performing exactly the same job tasks.  As in *Campbell*, the issue of whether these tasks are exempt is a predominant common question that can and should be resolved on a class-wide basis.

*Vinole* cited with approval district court decisions certifying overtime classes where, as here, there was evidence of centralized control in the form of standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs, and other factors susceptible to common proof. 571 F.3d at 956.  Like the cases certifying overtime classes approved of in *Vinole*, the evidence here also shows centralized control, standardized hierarchy, uniform training and standardized policies and procedures governing employees.

In *Bell v. Farmers Ins. Exchange*, 115 Cal.App.4th 715, 742 (2004) the Court of Appeal upheld class certification of overtime claims by insurance adjusters.[12]

---

[11] **The amount time the Class members spend performing non-exempt tasks is determinative of their exempt status under the CLC because the term "primarily" as used in the administrative exemption means "more than one-half the employee's work time."** 8 Cal.Code Regs. § 11040(2)(N). Here that standardized format each WC Claims Rep must follow ensures that each spends their time on the same tasks.

[12] In an earlier decision in *Bell* the Court of Appeal upheld summary judgment in favor of plaintiffs in *Bell* because the duties performed by the adjustors fell on the production side of the "administrative/production dichotomy" and the adjusters processed a large number of small individual claims that were "routine and unimportant" *Bell v. Farmers Ins. Exchange*, 87 Cal.App.4th 805, 827-28 (2001). While the merits of the case are not determined on class certification, the Ninth Circuit's decision upholding summary judgment on insurance adjuster FLSA claims in *In re Farmers Ins. Exchange, Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119 (9th Cir. 2007) is inapposite on the merits.  *Farmers* did not address a CLC or UCL claim but only addressed FLSA and Michigan statutory claims which apply a different standard.  Moreover the Ninth Circuit held that the property and casualty adjusters in *Farmers* were exempt because their job duties required them use "discretion

1

**D.    THIS ACTION MEETS THE REQUIREMENTS OF RULE 23(a)**

2

**1.    Numerosity of the Class Makes Joinder Impractical**

3

"The prerequisite of numerosity is discharged if the class is so large that joinder of all members

4

is impracticable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (quoting Fed. R. Civ.

5

P. 23(a)(1)). "[I]mpracticability does not mean 'impossibility,' but simply that joinder of all class

6

members must be difficult or inconvenient." *Harris v. Palm Springs Alpine Estates. Inc.*, 329 F.2d 909,

7

913 (9th Cir. 1964).   Numerosity is presumed once a proposed class exceeds 40 members.

8

*Consolidated Rail Corp., v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Town of New Castle*

9

*v. Yonkers Contracting Co.*, 131 F.R.D. 38, 41 (S.D.N.Y. 1990) (class of about thirty-six (36) satisfied

10

numerosity requirement).

11

The proposed Class in this matter consists of 444 persons who were employed by Defendants

12

as WC Claims Reps.   See Class List, <u>Exhibit 5</u>.   This Class is so numerous that the joinder of each of

13

these individuals is impractical. Accordingly, the numerosity requirement of Rule 23(a) is therefore

14

clearly met.

15

**2.    Common Questions of Law and Fact Exist**

16

Rule 23(a)(2) does not require that all questions of fact or law raised in the litigation be

17

common.   Rather, there need be only a single issue common to all members of the class for the

18

requirement of Rule 23(a)(2) to be met. *Newberg On Class Actions*, §3.10 (4th ed. 2003).   "When the

19

party opposing the class has engaged in some course of conduct that affects a group of persons and

20

gives rights to a cause of action, one or more of the elements of that cause of action will be common

21

to all of the persons affected." *Id.* (emphasis added). **"A class has sufficient commonality 'if there**

22

**are questions of fact and law which are common to the class.'"** *Hanlon v. Chrysler Corp.*, 150 F.3d

23

at 1019 (quoting Fed. R. Civ. P. 23(a)(2)). "All questions of fact and law need not be common to satisfy

24

this rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a

25

26

and independent judgment" and they did not use a standardized format to resolve claims.  Exactly the opposite is true under the facts here. The question on class certification is whether liability can be

27

adjudicated on a classwide basis. Here certification should be granted because all  WC Claims Reps perform the same tasks and the ultimate adjudication of whether those tasks are "exempt" will

28

determine the claims of all Class Members.

1    common core of salient facts coupled with disparate legal remedies within the class." *Id*.

2        Here,  the predominant common factual questions include: (1) whether all the members of the

3    Class that worked for the Defendants as WC Claims Reps in California during the Class Period were

4    uniformly classified by the Defendants as exempt; (2) whether the WC Claims Reps during the Class

5    Period were required by the Defendants to preform the same tasks, (3) whether the tasks primarily

6    preformed by the WC Claims Reps during the Class Period as required by the Defendants were data

7    input, data entry and data communication using a standardized format to perform their tasks; (4)

8    whether the WC Claims Reps during the Class Period were working on the production side of the

9    Defendants business of processing the Defendants' clients workers compensation claims, (5) whether

10   the acts of the WC Claims Reps during the Class Period on each file was so insignificant and

11   inconsequential such that no one act of a WC Claims Rep in preforming their tasks could conceivably

12   involve a matter of significance to the Defendants; and (6) whether Defendants uniformly required the

13   WC Claims Reps to follow the law, the Client Servicing Instructions and the Best Practices Guide

14   under a standardized format pursuant to which the WC Claims Reps could not exercise any independent

15   judgment or discretion as to matters of significance.

16       The commonality requirement is satisfied where, as here, Plaintiffs allege a "common course

17   of conduct." *Harris v. Palm Springs Alpine Estates, Inc*., 329 F.2d 909 (9th Cir. 1964). The necessary

18   showing to satisfy commonality is "minimal." *Hanlon,* 150 F.3d at 1020; *Whiteway,* 2006 WL 2642528

19   at *4. Commonality "is not defeated by slight differences in class members' positions." *Blackie,* 524

20   F.2d at 902.  Courts within the Ninth Circuit have consistently held that commonality exists in overtime

21   wage class actions despite variations among the putative class members' daily tasks, duties, and

22   responsibilities. *See e.g.*, *Whiteway,*, 2006 WL 2642528 at *4;  *Alba,*  2007 WL 953849 at * 11-12..

23              **3.       The Claims of the Class Representatives are Typical**

24       The typicality requirement ensures that the claims of the representatives and those of the absent

25   class members are sufficiently similar so that the representatives' acts safeguard the interests of the

26   class. *See*  7A C.A. Wright, A. Miller & M. K. Kane, *Federal Practice and Procedure*: Civil §1764.

27   **The typicality prerequisite  is fulfilled if 'the claims or defenses of the representative parties are**

28

---

**typical of the claims or defenses of the class.'"** *Hanlon,* 150 F.3d at 1020 (quoting Fed. R. Civ. P. 23(a)(3)). "Representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Id.* **Typicality exists where, as here, the class representatives and members of the class "share a common issue of law or fact,' and "are sufficiently parallel to insure a vigorous and full presentation of all claims for relief**." *California Rural Legal Assistance v. Legal Services Corp.,* 917 F.2d 1171, 1175 (9th Cir.1990).

Typicality is satisfied if the class representative was subject to the same common policies of the employer as the other class members and variations in job duties and actual hours of work does not defeat typicality. *Dukes v. Wal-Mart, Inc*., 509 F.3d 1168, 1184 (9th Cir. 2007) (different individual experiences did not make representatives' claims atypical, because their discrimination claim was based on an alleged common practice); *Kamar v. Radio Shack Corp*., 254 F.R.D. 387, 396 (C.D.Cal. 2008). "[C]laims of the named plaintiffs need not be identical to the claims of the class; they need only arise from the same remedial and legal theories." *Arnold v. United States Theatre Circuit, Inc*., 158 F.R.D. 439, 440 (N.D.Cal.1994)

Differences in the amount of damages cannot defeat typicality. *Blackie*, 524 F.2d 891; *Schwartz v. Harp,* 1088 F.R.D. 279, 282 (C.D. Cal. 1985). The claims of the proposed class representatives are typical of the claims of each and every other Class Member.  Like every other Class Member, each class representative was classified as exempt without regard to primary job duties under the uniform company policy and practice used by AJG.  Bhowmik Decl., ¶¶ 11 & 15.  The relief sought is the same relief which could be sought by each individual member of the class.  All damages arise out of the same course of conduct engaged in by AJG.  Thus, the typicality requirement is undoubtedly met in this case.

### 4. The Proposed Class Representative Will Fairly and Adequately Protect The Interests of the Class

Rule 23(a)(4) requires that the court must find that "the representative parties will fairly and adequately protect the interests of the class."  There are two conditions which must be met in order to satisfy this requirement. First, "the named representative must appear able to prosecute the action vigorously through qualified counsel," and "second, the representatives must not have antagonistic of conflicting interest with the unnamed members of the class." *Lerwill v. Inflight Motion Pictures, Inc*.,

---

1   582 F.2d 507, 512 (9th Cir. 1978); see also *Sosna v. Iowa*, 419 U.S. 393, 403 (1975).  "Only a conflict

2   that goes to the very subject matter of the litigation will defeat a party's claim of representative status"

3   *Hirschfeld v. Stone*, 193 F.R.D. 175, 183 (S.D.N.Y. 2000).

4          In the present action, the proposed class representatives can fairly and adequately protect the

5   interests of all members of the Class inasmuch as each representative Plaintiff was employed as a WC

6   Claims Rep and was misclassified as exempt by Defendants and suffered damage due to the same

7   policies and practices of Defendants.  Class Counsel, Blumenthal Nordrehaug & Bhowmik and United

8   Employees Law Group, are  experienced in handling class actions, particularly wage class actions.  The

9   resumes of these firms are attached as Exhibits 1 and 2 to the Declaration of Blumenthal.

10          **E.     RULE   23(B)(3)   IS   SATISFIED   BECAUSE COMMON QUESTIONS
               PREDOMINATE OVER ANY INDIVIDUAL QUESTIONS, AND A CLASS
11             ACTION IS SUPERIOR TO ANY OTHER METHOD OF ADJUDICATION**

12          Under Rule 23(b)(3), Plaintiffs must show that (1) common questions "predominate over any

13   questions affecting only individual members;" and (2) class resolution is "superior to other available

14   methods for the fair and efficient adjudication of the controversy."  "Certification under Rule 23(b)(3)

15   is appropriate "whenever the actual interests of the parties can be served best by settling their

16   differences in a single action."  *Hanlon,* 150 F.3d at 1022.

17                    **1.     Common Issues Predominate**

18          Rule 23 (b)(3)  provides that a class may be maintained if "the questions of law and fact

19   common to the members of the class predominate over any questions affecting only individual

20   members."  As the Ninth Circuit explained: "When common questions present a significant aspect of

21   the case and they can be resolved for all members of the class in a single adjudication, there is clear

22   justification for handling the dispute on a representative rather than on an individual basis." *Hanlon,*

23   150 F.3d at 1022; see also, *United Steel* 2010 WL 22701  at * 4;  *Kamar*,  254 F.R.D. at 399.

24          If the central questions concerning the defendant's liability are common to all class members,

25   the existence of other issues that must be individually resolved will not prevent certification.  "The very

26   definition of the requirement of predominance of common questions contemplates that individual issues

27   will usually remain after the common issues are adjudicated."  1 Herbert B. Newberg and Alba Conte,

28   *Newberg on Class Actions*, §4.25 at 4-82 to 4-83 (3d ed. 1992).  Further, the mere fact that there are

1  certain issues that may need to be determined on an individual basis does not preclude the satisfaction

2  of the predominance requirement. *Id.* at §4.25.  "[Q]uestions regarding damages will not adversely

3  affect plaintiffs' ability to demonstrate the predominance of common questions." *Ross v. U.S. Bank*

4  *Nat. Assoc.*,  2009 WL 4282426, * 9 (N.D.Cal. Nov 25, 2009) citing  *Blackie*, 524 F.2d at 905.

5      **Here the common liability issues that predominate with respect to the CLC and UCL**

6  **claims are whether the Defendants erred in applying the administrative exemption to the**

7  **members of the Class and whether the Defendants waived their fourth and fifteenth affirmative**

8  **defenses by Defendants' blanket assertion of the attorney-client privilege to withhold the evidence**

9  **upon which these defenses are based.**[13]

10      The expert opinion of the former Chief Counsel of Enforcement of the DLSE for the State of

11  California explains in detail how the facts in this case, as applied to the applicable law, raise six

12  predominant common questions of fact that can and should be decided here once for all times, rather

13  than on an *ad hoc* basis.  Locker Decl at pp.1-13.  These same factual questions are set forth as the

14  common questions of fact that predominate in section IV(D)(2) of this brief.

15      Under the UCL, adjudication of Defendants' liability is based solely upon a determination as

16  to whether the Defendants' employment classification practices with respect to the WC Claims Reps

17  are deceptive, unfair or unlawful.  The UCL prohibits any conduct that is either unfair or unlawful or

18  deceptive. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180

19  (1999); *Committee on Children's Television v. General Foods Corp.*, 35 Cal.3d 197, 210 (1983).

20      Here, Defendants' business practice of classifying all WC Claims Reps as exempt is alleged to

21  be unlawful because it violates the CLC.  The practice is also alleged to be deceptive because a

22  reasonable person is likely to believe their employer that they were properly classified as exempt  and

23  they were therefore not  legally entitled to overtime pay and other wage benefits which the Class

24  

25  ────────────

[13] Plaintiff also claims that Defendants  violated the requirement of Cal. Lab. Code §226(a) to provide employees with wage statements showing the overtime hours worked and seek  waiting time penalties pursuant to Labor Code § 203 for those members of the class who are no longer employed by Defendant. These derivative claims also satisfy the predominance requirement. See *Espinoza v. Domino's Pizza, LLC*,  2009 WL 882845 at * 12 (C.D. Cal. Feb. 18, 2009); *Perez v. Safety-Kleen Systems, Inc*., 253 F.R.D. 508, 520 (N.D. Cal. 2008) (where, as here,  failure to provide itemized wage statements was a class-wide practice, "litigation of these claims will involve class-wide proof rather than individual inquiries.")

26  

27  

28

1    Members were denied. Defendants' business practice is alleged to be unfair because this practice is

2    immoral, unethical, oppressive, unscrupulous and violates the public policy underlying California's

3    labor statutes to deprive non-exempt workers of overtime and other wages to which they are entitled.

4    Both the unfair and deceptive prong of the UCL claim can be resolved on a class wide basis because

5    both apply an objective test that focuses exclusively on the conduct of the defendant. *Massachusetts*

6    *Mutual Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1288 (2002).

7    **In fact and in law, Plaintiffs' UCL claims are  identical in all material respects to the**

8    **claims of every other member of the Class**. Other than the calculation of any restitutionary amounts

9    each class member may be entitled to receive from the fluid fund if liability is established, there are no

10   individual issues to decide with respect to the Defendants' liability under the UCL.

### 2.    Class Litigation Is Superior and Manageable

12       The facts of this case clearly demonstrate that the superior method of litigating this case is by

13   a class action rather than on an ad hoc individual basis.  As previously established, common questions

14   of law and fact predominate over individual issues.  In fact, the claims for relief are identical for all

15   Class Members.  In addition to the economic benefit certification as a class action provides to the

16   litigants, class certification also benefits the Court by preserving valuable judicial resources by

17   disposing of all of these claims in a single manageable action, as opposed to multiple actions.

18       "**Employer practices and policies with regard to wages and hours often have an impact on**

19   **large numbers of workers in ways that are sufficiently similar to make class-based resolution**

20   **appropriate and efficient**." *Kamar*, *supra*,  254 F.R.D. at 406; see also *Lerwill*, *supra*, 582 F.2d at

21   512-13 (upholding the trial court's decision to certify the class of technicians seeking overtime pay and

22   finding that "[n]umerous individual actions would be expensive and time-consuming ...."). .

23       Any notion that such claims could be litigated individually is not realistic and contrary to the

24   philosophy of Rule 23.  In the instant case, the expert and litigation costs alone will be in the hundreds

25   of thousands of dollars.  To litigate the predominate common questions individually would effectively

26   close the courthouse doors to the absent Class Members' claims against the Defendants.  Plaintiffs

27   foresee no management difficulties which would preclude this action from being maintained as a class

28

1   action.  There is no conflict of law problem as this case is substantively governed by California law.

2    Moreover, the potential for  management problems is not, standing along, grounds for denying class

3   certification.  *In re Sugar Industry Antitrust Litig.,* 73 F.R.D. 322, 358 (E.D. Pa. 1976) ("Manageability

4   problems are significant only if they create a situation that is less fair and efficient than other available

5   techniques. . ."); see also *In re Sugar Industry Antitrust Litig.,* 1976 WL 1374, at * 29 (N.D. Cal. May

6   21, 1976).

7          As *Campbell v. PricewaterhouseCoopers, LLP*, *supra*, 253 F.R.D. at 605 holds "**the interest**

8   **of members of the class in individually controlling the prosecution or defense of separate actions"**

9   **must give way to two competing concerns: the reality that class members may fear reprisal in**

10  **pursuing individual claims against their employer, and the fact that individual litigation against**

11  **a well-funded defendant would be cost prohibitive**. See also, *Scott v. Aetna Servs., Inc.*, 210 F.R.D.

12  261, 268 (D.Conn.2002).  Manageability concerns must be weighed against the alternatives and "will

13  rarely, if ever, be in itself sufficient to prevent certification of a class." *Klay v. Humana, Inc.*, 382 F.3d

14  1241, 1272 (11th Cir.2004);  *Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit*,

15  2009 WL 249888 , *6 (S.D.Cal. Feb. 2, 2009).

16         Class certification is far superior and more manageable than individual litigation.  Granting this

17  Motion for Class Certification ensures that the merits of the case can be fairly, fully and consistently

18  litigated and that a final determination, on the merits, can be reached.

19

20  **IV.     CONCLUSION**

21         For the foregoing reasons, Plaintiffs respectfully submit that this case should be certified to

22  proceed as a class action.

23
    Dated: January 13, 2010              **BLUMENTHAL NORDREHAUG  & BHOWMIK**
24
                                         By:   */s/ Norman B. Blumenthal*
25                                               Norman B. Blumenthal, Esq.

26                                       **UNITED EMPLOYEES LAW GROUP**
                                         Walter Haines (Bar No. 71075)
27                                       65 Pine Avenue, #312
                                         Long Beach, CA 90802
28

---

Telephone: (877) 696-8378
Facsimile: (562) 256-1006

**JAMES HAWKINS, APLC**
James R. Hawkins (SB# 192925)
Gregory E. Mauro (SB# 222239)
9880 Research Drive, Suite 200
Irvine, CA  92618
Telephone:  (949) 387-7200
Facsimile:  (949) 387-6676

**LAW OFFICES OF SEAN S. VAHDAT & ASSOCIATES**
Sean Sasan Vahdat (SB# 239080)
7700 Irvine Center Drive, Suite 800
Irvine, CA  92618
Telephone:  (949) 788-2949
Facsimile:  (949) 788-2950

Attorneys for Plaintiffs